# COURT OF APPEALS

OF

NORTH CAROLINA

AT

RALEIGH

KERRY BIGELOW & CLYDE CLARK, PLAINTIFFS-APPELLANTS
v.
TOWN OF CHAPEL HILL & ROGER STANCIL, IN HIS OFFICIAL CAPACITY AS
MANAGER OF THE TOWN OF CHAPEL HILL AND IN HIS PERSONAL CAPACITY, INSOFAR AS
HE WAS OPERATING OUTSIDE OF HIS JOB DESCRIPTION, DEFENDANTS-APPELLEES

No. COA12-1105

Filed 7 May 2013

**Public Officers and Employees—sanitation workers—wrongful
discharge**

Although the trial court did not err in a wrongful discharge case
by granting defendants' N.C.G.S. § 1A-1, Rule 12(c) motion for judg-
ment on the pleadings for defendant town manager Stancil in his
individual capacity, the remainder of the trial court's 29 May 2012
order was vacated and remanded. Plaintiff sanitation workers suf-
ficiently pled a claim for wrongful discharge.

Appeal by Plaintiffs from order entered 29 May 2012 by Judge R.
Allen Baddour, Jr., in Superior Court, Orange County. Heard in the Court
of Appeals 12 March 2013.

*Alan McSurely for Plaintiffs-Appellants.*

*Cranfill Sumner & Hartzog LLP, by Dan M. Hartzog and Dan M.
Hartzog, Jr., for Defendants-Appellees.*

McGEE, Judge.

1

**BIGELOW v. TOWN OF CHAPEL HILL**

[227 N.C. App. 1 (2013)]

Kerry Bigelow (Bigelow) and Clyde Clark (Clark) (together, Plaintiffs) were fired from their employment as sanitation workers for the Town of Chapel Hill (Chapel Hill) on 29 October 2010. Roger Stancil (Stancil) was Chapel Hill's town manager at that time. During their employment with Chapel Hill, Plaintiffs rode on town garbage trucks and collected refuse from roll-out canisters, as well as yard waste. The firings were based upon findings that Plaintiffs had engaged in insubordination, threatening and intimidating behavior, and had been unsatisfactory in their job performances. Plaintiffs requested a hearing before Chapel Hill's Personnel Appeals Committee (the Committee) to review the decision to terminate Plaintiffs' employment. Hearings were conducted on 3 and 9 February 2011. By split votes, the Committee recommended that Stancil uphold the decision to fire Plaintiffs.

Plaintiffs filed this action on 4 December 2011. In their complaint, Plaintiffs alleged that Chapel Hill and Stancil, in both his official capacity and his personal capacity, (together, Defendants), wrongfully discharged Plaintiffs from their jobs and violated certain of Plaintiffs' rights protected under the North Carolina Constitution.

Defendants answered Plaintiffs' complaint on 5 December 2011. Defendants moved for judgment on the pleadings on 20 April 2012. Defendants' motion was heard on 14 May 2012 and, by order entered 29 May 2012, the trial court granted Defendants' motion on the pleadings. Plaintiffs appeal. Additional facts and allegations relevant to this opinion are included below.

I.

The sole issue on appeal is whether the trial court erred in granting Defendants' Rule 12(c) motion for judgment on the pleadings. We affirm as to Stancil in his individual capacity, but vacate and remand the remainder of the trial court's 29 May 2012 order for further action.

II.

Plaintiffs present the following question on appeal: "Did the superior court err when it dismissed Plaintiffs' four claims based on the pleadings, pursuant to N.C. Rules of Civil Procedure 12(c)?"

"This Court reviews a trial court's grant of a motion for judgment on the pleadings *de novo*." *Carpenter v. Carpenter*, 189 N.C. App. 755, 757, 659 S.E.2d 762, 764-65 (2008) (citation omitted). "A motion for judgment on the pleadings should not be granted unless the movant clearly establishes that no material issue of fact remains to be resolved and that he

is entitled to judgment as a matter of law." *Id.* at 761, 659 S.E.2d at 767 (citation omitted).

> [Rule 12(c)'s] function is to dispose of baseless claims or defenses when the formal pleadings reveal their lack of merit. . . . . Judgment on the pleadings is a summary procedure and the judgment is final. Therefore, each motion under Rule 12(c) must be carefully scrutinized lest the nonmoving party be precluded from a full and fair hearing on the merits. The movant is held to a strict standard and must show that no material issue of facts exists and that he is clearly entitled to judgment. The trial court is required to view the facts and permissible inferences in the light most favorable to the nonmoving party. All well pleaded factual allegations in the nonmoving party's pleadings are taken as true and all contravening assertions in the movant's pleadings are taken as false. All allegations in the nonmovant's pleadings, except conclusions of law, legally impossible facts, and matters not admissible in evidence at the trial, are deemed admitted by the movant for purposes of the motion.

*Ragsdale v. Kennedy,* 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974) (citations omitted). " 'Judgments on the pleadings are disfavored in law[.]' " *Carpenter,* 189 N.C. App. at 757, 659 S.E.2d at 764-65 (citations omitted).

> " 'A motion for judgment on the pleadings is allowable only where the pleading of the opposite party is so fatally deficient in substance as to present no material issue of fact[.] A complaint is fatally deficient in substance, and subject to a motion by the defendant for judgment on the pleadings if it fails to state a good cause of action for plaintiff and against defendant[.]' "

*George Shinn Sports, Inc. v. Bahakel Sports, Inc.,* 99 N.C. App. 481, 486, 393 S.E.2d 580, 583 (1990) (citations omitted).

> Under the "notice theory" of pleading contemplated by Rule 8(a)(1), detailed fact-pleading is no longer required. A pleading complies with the rule if it gives sufficient notice of the events or transactions which produced the claim to enable the adverse party to understand the nature of it and the basis for it, to file a responsive pleading, and – by using the rules provided for obtaining pretrial discovery

– to get any additional information he may need to prepare for trial.

*Sutton v. Duke*, 277 N.C. 94, 104, 176 S.E.2d 161, 167 (1970). A motion to dismiss is appropriately granted when a complaint states "a defective cause of action," but not when a complaint states "a defective statement of a good cause of action." *Id.* at 105-06, 176 S.E.2d at 168 (citations omitted). "[O]ther provisions of Rule 12, the rules governing discovery, and the motion for summary judgment provide procedures adequate to supply information not furnished by the complaint." *Id.* "[A] document attached to the moving party's pleading may not be considered in connection with a Rule 12(c) motion unless the non-moving party has made admissions regarding the document." *Weaver v. Saint Joseph of the Pines, Inc.*, 187 N.C. App. 198, 205, 652 S.E.2d 701, 708 (2007).

### III. *Consideration of Alleged Facts for a Motion for Judgment on the Pleadings*

We wish to make clear that what follows is not a statement of facts, but a recitation of Plaintiffs' allegations as pleaded, and some additional information from the pleadings favorable to Plaintiffs. Defendants' alleged facts are not included below unless favorable to Plaintiffs. *Kennedy*, 286 N.C. at 137, 209 S.E.2d at 499. We are in no manner endorsing Plaintiffs' factual allegations. Plaintiffs' complaint, along with Defendants' answer and documents attached to the pleadings, when considered in the light most favorable to Plaintiffs, and taking Plaintiffs allegations as true, show the following: Plaintiffs, both African Americans, worked together as employees of Chapel Hill, beginning in the summer of 2009. Plaintiffs rode on the rear of collection trucks and emptied garbage bins into the trucks. Clark was hired as a sanitation worker by Chapel Hill in 1998. Bigelow drove large garbage trucks for the City of Burlington for eighteen years before being hired as a sanitation worker by Chapel Hill in 2007, where his "municipal sanitation driving experience placed him at the highest salary range for sanitation workers." Bigelow received a performance evaluation of "outstanding" in 2008, and also received an "exceeds expectations" evaluation in 2009.

According to Plaintiffs, Chapel Hill posted a job opening for a driving position in December 2009. Bigelow applied for the position. Darrell Town (Town), a white male hired shortly before Chapel Hill hired Bigelow, also applied. Town did not have experience driving garbage collection trucks. Prior to being hired by Chapel Hill, he had worked for less than four and a half years at a private recycling company. Town was hired at the low end of the salary range for sanitation workers.

Plaintiffs alleged that both Bigelow and Town were found qualified and both were interviewed. Bigelow's supervisor, an African American man, indicated that Bigelow would be a good choice for the job due to his prior heavy truck driving experience, his many years of working in sanitation, and because he was "a good person[.]" However, the Superintendent of Solid Waste, Harv Howard (Howard), a white male, selected Town, the less-qualified candidate, over the more experienced Bigelow. Bigelow filed a grievance through normal procedures on 12 February 2010. He alleged race discrimination in the hiring of Town, the less-experienced person, for the driving position. Racial discrimination in hiring is prohibited by [a Chapel Hill] town ordinance and written policies "promulgated by Defendant Stancil," a white male.

Plaintiffs alleged Bigelow had received no response from Chapel Hill by early June 2010, even though he had filed multiple grievances in February, March, and April. Bigelow retained an attorney who, in June 2010, wrote a "courtesy letter" to Chapel Hill, indicating that Bigelow was going to file a charge with the Equal Employment Opportunity Commission (EEOC) against Defendants. Bigelow filed an EEOC charge against Defendants on 9 June 2010.

The following day, Valerie Meicher (Meicher) sent a memorandum on behalf of Chapel Hill thanking Bigelow " 'for participating in the recent selection interviews[,]' " and indicated that, " 'in response to a complaint[,]' " Chapel Hill had "determined there were inconsistencies in the administration of the interview process." The "complaint" was in actuality the multiple grievances filed by Bigelow. Bigelow was invited to speak with a Chapel Hill official "about the date, time, and place of another interview." Chapel Hill had three different versions of this memorandum circulating "within . . . Stancil's management team" after Chapel Hill became aware of the EEOC charge. Chapel Hill also sent Bigelow's attorney a letter stating that it had finally completed its investigation into Bigelow's grievances. Defendants had placed Bigelow in the pool of applicants qualified for the driving position, and had interviewed him, but stated to the EEOC that they had hired the lesser-qualified Town because Bigelow was *unqualified* for the position.

Plaintiffs alleged that "Defendants engaged in heated arguments about whether to admit that Superintendent Howard's selection of the less qualified white applicant over . . . Bigelow was race discrimination." Plaintiffs alleged such an admission would jeopardize certain federal funding Chapel Hill received, and would give a boost to "Union organizing efforts." Plaintiffs alleged Chapel Hill knew the hiring of Town over Bigelow was discriminatory and that responding "in an honest, accurate,

and timely manner" to Bigelow's "challenge" would create "a crisis within the Public Works Department." Plaintiffs also alleged that Stancil personally endorsed delay tactics that violated his own policies and the policies of Chapel Hill. Meicher reported directly to Stancil concerning the Bigelow issue. Meicher and Howard both resigned their "good jobs with [Chapel Hill] in the fall of 2010, as Defendants carried out the decision to discharge Plaintiffs."

According to Plaintiffs' complaint, they were penalized for other actions they took that affected Chapel Hill. In mid-March 2010, Clark complained to Howard concerning dangerous activities undertaken by the driver of the truck on which Clark and Bigelow worked. In early March, the driver, James Jones (Jones) was parking in the center (turn) lane of the five-lane Martin Luther King Boulevard in Chapel Hill, causing Clark to have to run across two lanes of traffic to collect garbage bins. Clark then had to drag the bins back across the two lanes of traffic to empty them into the truck. Bigelow took photographs of this practice, and when Jones saw Bigelow taking photographs, Jones "sped up the hill, leaving both of his collectors with no protection in the middle of the Boulevard." When Clark complained to Howard, he showed Howard some of those photographs.

Plaintiffs alleged that Howard responded to Clark's concerns by stating that he "was not interested in the complaints about unsafe working conditions, and that [] Clark should 'not let [] Bigelow put you into something you can't get out of.' " Jones was never "counseled or disciplined" for his unsafe driving practices, and drivers for Chapel Hill continued to engage in unsafe driving practices. Because drivers and collectors were not paid hourly, they received the same amount no matter how long it took to complete a route. Drivers rushed to complete routes as quickly as possible so they could take on second jobs "to supplement the low pay of [Chapel Hill]." Chapel Hill and Stancil were aware of these "incentive[s] for the workers to cut safety corners[.]"

According to Plaintiffs' complaint, Chapel Hill had a policy, promulgated by Stancil on 9 November 2007, which required Stancil to expediently and thoroughly investigate complaints of safety violations and discrimination, resolve issues, and " 'learn from the incident[s] and revise expectations and Policy as appropriate.' " Stancil did not follow this policy in response to Plaintiffs' complaints.

Plaintiffs further alleged that Howard responded to Plaintiffs' complaints by requiring a meeting on 18 March 2010, and by directing Larry Stroud (Stroud), the Solid Waste Supervisor, to tell Plaintiffs' co-workers

that Plaintiffs " 'were messing up everything for the guys, and . . . that the guys would probably end up working 10 hours a day.' " Howard and Stroud "engaged in a campaign against Plaintiffs, saying [Plaintiffs] were trying to take away" the system whereby collectors could leave as soon as they finished their routes. Plaintiffs were at the meeting, and were singled out by Howard and Stroud, which resulted in co-workers "glaring" at Plaintiffs and telling them to stop filing grievances. Chapel Hill retaliated against Bigelow by informing Public Works employees that Bigelow had caused Jones to lose his driving job.

Plaintiffs began posting Union notices and articles on the employee bulletin board in early March 2010, and began talking with other employees about the N.C. Public Service Workers Union, which had made several earlier attempts to organize workers in Chapel Hill. On 23 March 2010, Defendants engaged Capital Associated Industries (CAI), "a right-wing consulting company that advertises it helps municipalities prevent unions from gaining a foothold in their workplaces[,]" to " 'uncover' and 'understand' the 'recent allegations in the Public Works Department[.]' " CAI was to investigate the issues surrounding Bigelow and Clark, and then give a " 'summary report and recommendations to the [Chapel Hill] Town Attorney.' " Plaintiffs alleged, "on information and belief," that the purpose of having CAI provide a report to the Chapel Hill town attorney was to protect its contents through attorney-client privilege.

Plaintiffs claim that they continued to "associate and to speak out about matters of important public policy," including discrimination and workplace safety. They also joined the N.C. Public Service Workers Union, UE-150, in April 2010. Chapel Hill was aware of Plaintiffs' union status. Plaintiffs and the union "helped other workers file grievances in the spring and summer of 2010." Plaintiffs asked the mayor and town council of Chapel Hill to insure that deadlines on responding to grievances were followed and that workers' rights to " 'meet and confer' " were upheld. Defendants were upset that Plaintiffs had contacted the mayor. Stancil's strategy was to "dig up some dirt" on Plaintiffs and "discharge them, in the hopes this would avert a crisis" in the Public Works Department.

Plaintiffs alleged that, in mid-July 2010, a Chapel Hill resident called and left a complaint related to Bigelow and Clark. At a later Committee hearing, this resident was referred to by the pseudonym, "Ms. Johnson" (Johnson) because she wished to remain anonymous. Johnson said a political fundraiser was to be held in her neighborhood, that it was to be attended by Vice President Biden, and that she had asked Plaintiffs to take more yard waste so her yard "would look nice for the Vice

President." Johnson stated that the "guys on the back of the truck said something like 'who the h\*\*\* is paying for a $500 room at the Carolina Inn,' and 'he's not here to see the common man.' " Johnson said this response upset her, and that she " 'felt threatened' and was afraid to report the interaction" lest she be " 'retaliated against.' "

That same day, Richard Terrell (Terrell), a member of the Public Works management team, visited Johnson's neighborhood to investigate. Terrell determined that the brush had been collected and that the only remaining issue was whether Bigelow and/or Clark had made inappropriate remarks to Johnson. Terrell "concluded that if the remarks were deemed inappropriate, 'counseling, oral or written warning' would be available" for Plaintiffs.

According to Plaintiffs, Johnson emailed photographs to Chapel Hill on 9 September 2010. The photographs showed " 'what was left on Sandy Creek [Rd.]' in front of her house," and Johnson stated she was tired of having to rake the street after the crew had collected the yard debris. Johnson refused to be interviewed by CAI.

Following the departure of Howard and Meicher from employment by Chapel Hill, Plaintiffs were placed on administrative leave and instructed to stay off Chapel Hill property. Plaintiffs "were given no specific charges, written or oral, when they were ejected from [Chapel Hill] property or at any time after that before they were fired." Chapel Hill's policy is to

> afford its employees certain due process rights[,] . . . [including] provid[ing] "specific" performance problems with the employee in a counseling session, and then two more written warnings, before termination. Here, where the initial complaints involved poor performance (not picking up yard waste), these warnings were required. In this case, no counseling[] or any disciplinary meetings were ever provided [to Plaintiffs] before they were summarily discharged.

Chapel Hill fired Plaintiffs in late October 2010.

Subsequent to Plaintiffs' firings, the Committee held hearings to address the issues surrounding the firings. Plaintiffs alleged that during the hearings, the voices of two unidentified women were "piped in to the [Chapel Hill] Library conference room." There was no way for Plaintiffs to identify to whom the voices belonged. The two women read prepared statements and would not answer any questions. "It is not known who

wrote the statements for them, or when they were written." The women stated they were told all they would have to do was read the written statements, and that they would not have to answer any questions.

Defendants attached the Committee findings and reports to their answer. We therefore consider these reports only to the extent they support Plaintiffs' claims. The Committee consisted of a five-person panel. The Committee voted three to two in favor of upholding Bigelow's termination by Chapel Hill, and voted four to one in favor of upholding Clark's termination.

The following information was included in Committee documents attached to Defendants' answer. Committee members expressed concern that, though Bigelow's conduct was confrontational, the situation should have been handled with progressive disciplinary action, and that Chapel Hill failed to substantiate that Bigelow's behavior "rose to the level of threatening and intimidating behavior or detrimental personal conduct." Members were "unconvinced" that the anonymous "testimony" of one of the female witnesses "corroborated the allegation of threatening and intimidating behavior," especially because that witness stated that, though she found Bigelow's behavior " 'rude' " and felt he had not done a satisfactory job, she did not want him fired. "She just wanted her old crew back, a crew which included [] Bigelow." Members were concerned that they were not allowed to question the anonymous witnesses and therefore "could not get the information necessary to come to a determination." They were further "troubled by the lack of a clear response from [Chapel Hill] regarding exactly which public complaints had been independently verified by a member of [Chapel Hill] management, and how many different incidents the complaints actually referenced." Members believed that Bigelow's conduct towards co-workers was "behavior . . . tolerated as part of the culture of the department." Members found that Chapel Hill did not follow its own policies before it terminated Bigelow. There was no direct evidence that Bigelow had been informed that his behavior was inappropriate, or warned that failure to amend his behavior could lead to termination. Two members cited Chapel Hill policy: " 'Normally employees receive counseling and several warnings and are given adequate time and assistance such as training or coaching before disciplinary actions result from unsatisfactory job performance.' " These members felt that Chapel Hill's failure to comply with its own policy "contributed to the escalation of a problem that might have been resolved with appropriate warnings and counseling[.]" These members were particularly concerned that Chapel Hill knew of the complaints "early on" but did not inform Bigelow, nor provide

the counseling or warnings dictated by policy that could have allowed Bigelow to address the offending behavior.

With respect to Clark, different members believed either that Clark was being unfairly held responsible for some of Bigelow's actions, that Clark's conduct was merely "discourteous" and should have been handled through "the progressive disciplinary procedures outlined in [Chapel Hill's] personnel manual," or that Chapel Hill had failed to prove the alleged behavior. One member was troubled that previous disciplinary actions related to Clark that were presented by Chapel Hill occurred before 2006, and that the only recent written warning concerned Clark's attendance, not inappropriate behavior.

We reiterate that none of the above allegations constitute established facts. They are alleged facts, and reasonable inferences therefrom, included in this opinion solely for our Rule 12(c) analysis.

We note that Defendants seem to misconstrue how documents attached to Defendants' pleadings are to be considered when ruling on Defendants' Rule 12(c) motion. Defendants cite heavily to certain findings made by the Committee and portions of the CAI report that support Defendants' argument that Plaintiffs were discharged for legitimate, not wrongful, reasons. For instance, Defendants state in their brief: "As established above, the CAI report found that Plaintiffs had directly contributed to low morale in the department, created fear among residents to the point where citizens were afraid to interact with [Chapel Hill] employees, [and] were consistently insubordinate and disrespectful to their supervisor[.]" Alleged facts in documents attached to Defendants' pleadings, just as alleged facts in Defendants' pleadings, are not considered in Defendants' motion for judgment on the pleadings unless Plaintiffs have admitted the alleged facts, or the alleged facts support Plaintiffs' claims. *Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499; *see also Weaver*, 187 N.C. App. at 205, 652 S.E.2d at 708. The fact that findings in the documents might support a conclusion that Plaintiffs were discharged for lawful and legitimate reasons cannot factor in our review of the trial court's decision to grant Defendants' motion on the pleadings.

## IV. *Wrongful Discharge*

Plaintiffs' fourth claim is for wrongful discharge. We limit this portion of the opinion to the wrongful discharge claim against Chapel Hill.

An employer wrongfully discharges an at-will employee if the termination is done for "an *unlawful reason or purpose* that contravenes public policy." As stated in

*Amos*, the public-policy exception was "designed to vindicate the rights of employees fired for *reasons* offensive to the public policy of this State." This language contemplates a degree of intent or wilfulness on the part of the employer. In order to support a claim for wrongful discharge of an at-will employee, the termination itself must be motivated by an unlawful reason or purpose that is against public policy.

*Garner v. Rentenbach Constructors Inc.*, 350 N.C. 567, 571-72, 515 S.E.2d 438, 441 (1999) (citations omitted).

Although the definition of "public policy" approved by this Court does not include a laundry list of what is or is not "injurious to the public or against the public good," at the very least public policy is violated when an employee is fired in contravention of express policy declarations contained in the North Carolina General Statutes.

*Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 353, 416 S.E.2d 166, 169 (1992) (footnote omitted). However, "[u]nder the rationale of [Supreme Court precedent] something more than a mere statutory violation is required to sustain a claim of wrongful discharge under the public-policy exception." *Garner*, 350 N.C. at 571, 515 S.E.2d at 441. "[A] degree of intent or wilfulness on the part of the employer [is required]." *Id.* at 572, 515 S.E.2d at 441. "[T]he termination itself must be motivated by an unlawful reason or purpose that is against public policy." *Id.*

Although Plaintiffs' complaint is not a model of clarity, Plaintiffs need only to allege facts sufficient to support a claim that their firing was "motivated by an unlawful reason or purpose that is against public policy." *Id.* Plaintiffs alleged they were fired in retaliation for actions in which they were legally permitted to engage, and that this constituted a violation of public policy. If these allegations are supported by alleged facts in the pleadings, Plaintiffs have pled a valid claim. *Kennedy*, 286 N.C. at 137, 209 S.E.2d at 499.

First, Plaintiffs' complaint alleged that Bigelow took photographs of unsafe driving conditions, and that Clark used those photos and lodged a complaint with Howard. Howard's alleged response was that he was not interested, and that Clark should not let Bigelow " 'put you into something you can't get out of.' "

Chapter 95, Article 21 of the North Carolina General Statutes is the

Retaliatory Employment Discrimination Act (REDA). N.C. Gen. Stat. § 95-241 of REDA states:

> (a) No person shall discriminate or take any retaliatory action against an employee because the employee in good faith does or threatens to do any of the following:
>
> > (1) File a claim or complaint, initiate any inquiry, investigation, inspection, proceeding or other action, or testify or provide information to any person with respect to any of the following:
>
> . . . .
>
> > b.    []Article 16 of this Chapter.

N.C. Gen. Stat. § 95-241(a)(1)b. (2011). Article 16 is the Occupational Safety and Health Act of North Carolina (OSHANC). OSHANC states its legislative purpose in part as follows:

> (2) The General Assembly of North Carolina declares it to be its purpose and policy through the exercise of its powers to ensure so far as possible every working man and woman in the State of North Carolina safe and healthful working conditions and to preserve our human resources:
>
> > a.    By encouraging employers and employees in their effort to reduce the number of occupational safety and health hazards at the place of employment, and to stimulate employers and employees to institute new and to perfect existing programs for providing safe and healthful working conditions;
> >
> > b.    By providing that employers and employees have separate but dependent responsibilities and rights with respect to achieving safe and healthful working conditions;
> >
> > . . . .
> >
> > d.    By building upon advances already made through employer and employee initiative for providing safe and healthful working conditions;
> >
> > . . . .
> >
> > h.    By providing for appropriate reporting procedures with respect to occupational safety and health

which procedures will help achieve the objectives of this Article and accurately describe the nature of the occupational safety and health problem;

i. By encouraging joint employer-employee efforts to reduce injuries and diseases arising out of employment;

N.C. Gen. Stat. § 95-126(2) (2011). "The primary purpose of both the federal and state provisions prohibiting retaliatory discrimination is to ensure that employees are not discouraged from reporting violations of [OSHANC]." *Brooks v. Stroh Brewery Co.*, 95 N.C. App. 226, 229, 382 S.E.2d 874, 877 (1989).

Second, Plaintiffs alleged they were fired for engaging in union activities, including recruiting and using union attorneys to assist Plaintiffs in helping other employees file grievances. N.C. Gen. Stat. § 95-81 states: "No person shall be required by an employer to abstain or refrain from membership in any labor union or labor organization as a condition of employment or continuation of employment." N.C. Gen. Stat. § 95-81 (2011).

Third, Plaintiffs alleged that Chapel Hill retaliated against Bigelow for filing discrimination grievances, including Bigelow's grievance filed in response to the hiring of Town for the driving position. N.C. Gen. Stat. § 95-151 states: "No employer, employee, or any other person related to the administration of this Article shall be discriminated against in any work, procedure, or employment by reason of sex, race, ethnic origin, or by reason of religious affiliation." N.C. Gen. Stat. § 95-151 (2011). A retaliatory firing based upon an employee's filing of a claim of discrimination in the workplace clearly violates public policy and could support a wrongful discharge claim. Furthermore, Bigelow initiated an EEOC charge against Chapel Hill based upon his perceived lack of response to his discrimination grievance. Retaliation against an employee for filing an EEOC charge is also a violation of public policy. *Brewer v. Cabarrus Plastics, Inc.*, 130 N.C. App. 680-81, 691, 504 S.E.2d 580, 586-87 (1998).

Fourth, Plaintiffs alleged that Chapel Hill violated their rights under the North Carolina Constitution by firing them for protected acts. Specifically, Plaintiffs alleged they were fired for acts protected by Article I, Section 14: "Freedom of speech . . . shall never be restrained[.]" N.C. Const. art. I, § 14. Plaintiffs alleged that they were fired for pro-union activities such as posting union notices and articles on the employee bulletin board and talking about the N.C. Public Service Workers Union with co-workers, speaking about dangerous workplace practices, and for political speech directed at a resident. Plaintiffs further alleged they

were fired for acts protected by Article I, Section 19: "No person shall be . . . disseized of his . . . privileges . . . or in any manner deprived of his . . . property, but by the law of the land. No person shall be denied the equal protection of the laws; nor shall any person be subjected to discrimination by the State because of race, color, religion, or national origin." N.C. Const. art. I, § 19. Plaintiffs alleged that they were deprived of property and privileges – their jobs – in a manner inconsistent with the "law of the land." Specifically, they alleged that they were fired on the pretext of a report produced by an anti-union organization, when the actual reasons for their firings were those outlined in their complaint. Plaintiffs also alleged they were retaliated against, and fired, based in part on race. They alleged a continuing pattern of discrimination against Bigelow in promotion practices and handling of his discrimination grievances, and that discrimination played a significant part in the handling of the complaints of white residents. Violations of a plaintiff's rights under the North Carolina Constitution violate public policy and will support a claim of wrongful discharge from public employment. *Whitings v. Wolfson Casing Corp.*, 173 N.C. App. 218, 222, 618 S.E.2d 750, 753 (2005); *Johnson v. Mayo Yarns, Inc.*, 126 N.C. App. 292, 295-97, 484 S.E.2d 840, 843 (1997); *Lenzer v. Flaherty*, 106 N.C. App. 496, 514-15, 418 S.E.2d 276, 287 (1992).

While we make no determinations on the merits of Plaintiffs' wrongful discharge claim, we hold that Plaintiffs have sufficiently pled a claim for wrongful discharge. We vacate the trial court's dismissal of this claim against Chapel Hill and remand for further action.

V. *North Carolina Constitutional Claims*

Plaintiffs' remaining claims are all based in the North Carolina Constitution.

> In *Corum v. University of North Carolina,* our Supreme Court held that one whose state constitutional rights have been abridged has a direct claim under the appropriate constitutional provision. 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992). A claim is available, however, only in the absence of an adequate state remedy. As plaintiff's rights are adequately protected by a wrongful discharge claim, a direct constitutional claim is not warranted. The trial court did not err when granting defendants' motion to dismiss based on plaintiff's free speech claim.

*Phillips v. Gray*, 163 N.C. App. 52, 58, 592 S.E.2d 229, 233 (2004) (some citations omitted). "[A]n adequate remedy must provide the possibility of

relief under the circumstances." *Craig v. New Hanover Cty Bd. of Educ.*, 363 N.C. 334, 340, 678 S.E.2d 351, 355 (2009) (holding that when sovereign immunity bars a claim, no adequate state remedy exists, and the plaintiff may proceed directly under the North Carolina Constitution).

Plaintiffs' complaint alleged that Chapel Hill "purchased liability insurance which waives any claim to immunity it or its employees may have." Defendants' answer admitted Chapel Hill had insurance "which provides certain coverage to [Chapel Hill] with respect to Plaintiffs' claims" but denied that Chapel Hill had waived any claim to immunity. Defendants' second defense is a plea of "sovereign and governmental immunity as a defense to all applicable claims asserted herein and to the extent not waived by the purchase of insurance[.]"

As long as Defendants' sovereign immunity defense remains potentially viable for any or all of Plaintiffs' wrongful discharge-related claims, our Supreme Court's decision in *Craig*, 363 N.C. at 340, 678 S.E.2d at 355, dictates that Plaintiffs' associated North Carolina constitutional claims are not supplanted by those claims. "This holding does not predetermine the likelihood that plaintiff will win other pretrial motions, defeat affirmative defenses, or ultimately succeed on the merits of his case. Rather, it simply ensures that an adequate remedy must provide the possibility of relief under the circumstances." *Id.*

> [T]he notice theory of pleading does not necessarily mean that there must be a full-blown trial. Utilizing the "facility of pretrial discovery, the real facts can be ascertained and by motion for summary judgment (or other suitable device) the trial court can determine whether as a matter of law there is any right of recovery on those facts."

*Sutton*, 277 N.C. at 104, 176 S.E.2d at 167 (citation omitted).

We note that the reasoning in *Craig* may be applicable to situations other than loss of the ability to pursue an adequate state remedy because of sovereign immunity. The reasoning in *Craig* clearly does not extend to situations where a plaintiff has lost the right to pursue an adequate state remedy due to his own action.

> [T]he facts presented here are distinguishable from a case in which a plaintiff has lost his ability to pursue a common law claim due to expiration of the statute of limitations, for example. Sovereign immunity entirely precludes this plaintiff from moving forward with his common law claim; without being permitted to pursue his direct colorable

constitutional claims, he will be left with no remedy for his alleged constitutional injuries.

*Craig*, 363 N.C. at 340, 678 S.E.2d at 355-56.

We vacate that portion of the order dismissing the constitutional claims against Chapel Hill, and remand for further action consistent with this opinion.

## VI. *Claims Against Stancil*

Stancil was sued in both his official and individual capacities for his alleged actions in this matter. First, North Carolina does not recognize direct North Carolina constitutional claims against public officials acting in their individual capacities. *Corum v. University of North Carolina*, 330 N.C. 761, 789, 413 S.E.2d 276, 293 (1992). To the extent, if any, that Plaintiffs' constitutional claims were also against Stancil in his individual capacity, dismissal of those claims is affirmed. As for Plaintiffs' individual wrongful discharge claim against Stancil, our *de novo* review of the pleadings finds no factual allegations supporting Plaintiffs' conclusory allegation that "Stancil was acting outside the scope of his official duties in hiring" CAI. Plaintiffs' complaint "fails to state a good cause of action" against Stancil in his individual capacity. *George Shinn Sports*, 99 N.C. App. at 486, 393 S.E.2d at 583 (citations omitted). We affirm the dismissal of all claims against Stancil acting in his individual capacity.

Concerning Plaintiffs' claims against Stancil in his official capacity:

> An official capacity suit, such as the one here, is "merely another way of pleading an action against the governmental entity." *See also Moore v. City of Creedmoor*, 345 N.C. 356, 367, 481 S.E.2d 14, 21 (1997) (official capacity claim under 42 U.S.C. § 1983 is only another way of pleading a claim against the governmental entity of which officer is an agent and "[t]hus, where the governmental entity may be held liable for damages resulting from its official policy, a suit naming public officers in their official capacity is redundant"). As a result, Oakwood's claims against Womack in his official capacity as Johnston County's Tax Collector are identical to its claims against Johnston County and our analysis of the viability of the Johnston County claims applies equally to Womack.

*Oakwood Acceptance Corp. v. Massengill*, 162 N.C. App. 199, 211-12, 590 S.E.2d 412, 421-22 (2004) (some citations omitted); *see also White*

*v. Trew,* __ N.C. __, __, 736 S.E.2d 166, 168 (2013); *Mullis v. Sechrest,* 347 N.C. 548, 554, 495 S.E.2d 721, 725 (1998). Plaintiffs' claims against Stancil in his official capacity are identical to Plaintiffs' claims against Chapel Hill. *Oakwood,* 162 N.C. App. at 211-12, 590 S.E.2d at 422. Our above analysis of Plaintiffs' claims against Chapel Hill applies equally to the claims against Stancil in his official capacity. *Id.*

Affirmed in part, vacated and remanded in part.

Judges GEER and DAVIS concur.