STEPHENS, Judge.
 

 *515
 
 Defendant City of Boiling Spring Lakes ("the City") appeals from an order issued pursuant to N.C. Gen. Stat. § 40A-47
 
 [1]
 
 determining all issues other than compensation. The City argues that the trial court erred by concluding that an inverse condemnation occurred, because (1) the City's actions were not for a public use or benefit, (2) the flooding of the Wilkies' property was temporary and not subject to recurrence, (3) the City was not able to foresee encroachment onto or damage to the Wilkies' property, (4) the trial court misapplied the balancing test enumerated by the United States Supreme Court, (5) the trial court failed to address the City's defense of estoppel, and (6) the trial court failed to determine the boundary line and area of the property taken. We agree that the trial court erred in finding that there was a taking of the Wilkies' property by inverse condemnation when the City's actions were not for the public use or benefit.
 

 Factual and Procedural Background
 

 The Wilkies own two lots that border Spring Lake in the city of Boiling Spring Lakes. The City owns Spring Lake. The lake is fed by natural, underground springs in the lake and surface runoff. Excess water drains from the lake through two pipes at the west end of the lake. The City replaced those two pipes in 2006.
 

 On 25 June 2013, the Board of Commissioners of Boiling Spring Lakes held a workshop meeting. At that meeting, the Board was presented with a petition signed by twenty-one residents of the City who owned property bordering the north side of Spring Lake. The petition asserted that the lake level was lowered by the 2006 pipe replacement,
 
 *516
 
 and asked that the Board take action to raise the lake level to restore it to its level before 2006. No action was taken on the petition at this meeting, but it was decided to discuss the issue again at the Board's July meeting.
 

 The names of both Mr. and Mrs. Wilkie appeared on the petition to raise the lake level. Mrs. Wilkie signed both names to the petition. She testified that she "thought [the petition] was a joke."
 

 On 2 July 2013, at the Board's regular meeting, the petition and the issue of the Spring Lake water level were again discussed. All five commissioners, the mayor, and property owner Jane Falor took part in the discussion. Several commissioners had been to the lake to examine the water level
 
 *59
 
 and the drainage pipes. In addition, three commissioners had spoken with Larry Modlin, Director of Public Works for the City at that time, and one commissioner spoke with the city manager to discuss the lake level and possible ways to raise it. Commissioner Caster stated that Modlin advised him that one simple way to restore the lake level would be to install an "elbow" on each drainage pipe for approximately two hundred dollars, which could be easily removed if it did not work or to prevent flooding in the event of a storm. In addition, it was noted that one of the existing pipes was clogged, which needed to be fixed. Following the discussion, the Board voted 5-0 to "return Spring Lake to its original shore line as quickly as can be done."
 

 On 11 July 2013, the City installed the elbows on the drainage pipes in Spring Lake. The elbows increased the height of the drainage pipes by six inches. The intent of this action was to maintain the lake level where it was on 2 July 2013.
 

 On 6 August 2013, the Board held another regular meeting. Several property owners whose lots abut Spring Lake attended the meeting, including Mr. Wilkie. One property owner presented the Board with a second petition signed by twenty property owners, five of whom had signed the initial petition to raise the lake level. This second petition complained that the lake level was too high, and requested that it be restored to the level it had been prior to the installation of the elbows. Mr. Wilkie signed this petition. In addition, several of the property owners spoke at the meeting. Mr. Wilkie and two other property owners spoke to complain about the flooding on their property that they attributed to the installation of the elbows. One property owner attributed the flooding to increased rainfall and slow drainage of excess water from the lake, and asked the Board to give the lake time to "stabilize to more normal conditions."
 

 *517
 
 Commissioner Glidden read a statement acknowledging the flooding problem, but differentiating the flooding due to problems with drainage speed from problems with the lake level, which the elbows were installed to maintain. She explained that the elbows "did accomplish what we thought we were going to accomplish," but that once they were installed, "Mother Nature played her trick on us and started raining." The Board voted to hold a workshop and special meeting on 17 August 2013 to address the Spring Lake water level, and to lower the lake level by three inches for the eleven days prior to the special meeting to alleviate flooding.
 

 The City sent out a notice of the special meeting to the property owners whose lots bordered on Spring Lake, and invited them to address the Board regarding the lake level. On 17 August 2013, the Board held the special meeting. Ten property owners spoke and addressed their concerns to the Board regarding the lake level. Some, including Mr. Wilkie, complained that their property was flooded as a result of the Board's action to raise the lake level. Mr. Wilkie stated that he had "lost about 20' to 30' of property which is under water now." Other property owners urged that the flooding was not due to the elbows, but rather due to substantial rainfall, and the inability of the lake to drain as quickly as the runoff accumulated. Still other owners asked that the lake level be raised further. One property owner, David Crawford, pointed out that only five people who had signed the petition to raise the lake level had now changed their minds.
 

 The city manager stated that he had met with a representative from the North Carolina Department of Environment and Natural Resources, Water Management Division, who had come down to inspect the situation, but was unable to determine the proper water level for the lake. Multiple commissioners expressed concern that the high levels of rainfall were complicating the issue, and urged waiting until the water level stabilized before taking further action. A motion to reduce the lake level by two inches to alleviate the flooding that did exist was defeated. The Board ultimately adjourned, taking no action, but advising property owners to continue to monitor the lake level.
 

 The level of Spring Lake was discussed again at the September and October Board meetings, with residents speaking both for and against lowering the lake level. At the 1 October 2013 meeting, Mr. Wilkie indicated that the Eldridge Law Firm had sent a letter
 
 *60
 
 to the Board, that he had given information to the Board on inverse condemnation, and that the City would "be sued over the elbow on the Lake." Motions to remove the elbows were defeated at both meetings.
 
 *518
 
 Only one property owner spoke at the 12 November 2013 meeting, and she urged the Board to continue to evaluate the facts regarding the lake level. The Board did not discuss the issue. At the 7 January 2014 meeting, two property owners, including Mr. Wilkie, spoke about the flooding still being caused by the high water level of Spring Lake. A motion to remove the elbows was again defeated.
 

 On 13 January 2014, the Board held another special meeting to discuss Spring Lake. Two property owners spoke, and requested that the water level be raised back to the level of 2 July 2013. After discussion of the lake level and the related issue of whether Spring Lake had enough drainage pipes to allow it to drain excess water fast enough, the Board voted to have an engineering study done to determine the proper lake level.
 

 On 4 February 2014, Mr. Wilkie spoke briefly at the Board's regular meeting, again requesting that the elbows be removed. The Board voted to have SunGate Design Group ("SunGate"), an engineering firm, address the Board to explain the work they proposed to do involving the Spring Lake water level. The Board held a workshop on 26 March 2014 to hear SunGate's proposal. At the workshop, Henry Wells, vice president of SunGate, spoke regarding the methodology his firm would use to determine the appropriate lake level for Spring Lake. Wells indicated that the preliminary study would take about a month to complete, and that following the study, adjustments could be made so that the lake could drain at the correct speed. Several property owners also spoke, including Mr. Wilkie, who asserted that the elbows caused the flooding.
 

 On 1 April 2014, Mr. Wilkie again spoke at the Board's regular meeting. He urged the City to "address the problem with the residents that have low lake levels and those of us who have flooding issues." Also at this meeting, the Board unanimously approved entering into a contract with SunGate to determine the correct lake level for Spring Lake.
 

 On 10 June 2014, the Board held a workshop and special meeting for SunGate to discuss the results of the preliminary engineering report on the Spring Lake water level. Henry Wells again spoke on behalf of SunGate. He explained that SunGate's recommendation was to reduce the lake level to where it was before the elbows were installed, and to add a pipe to help the excess water drain more efficiently. Several property owners then spoke, both in favor of and against taking action in accordance with SunGate's recommendation.
 

 SunGate subsequently submitted an engineering report to the Board dated 10 July 2014. The report included in its summary and conclusions
 
 *519
 
 that SunGate had looked at the deeds transferring Spring Lake to the City, and could not find authority for the City to increase the level beyond the lake as it was shown on a 1960 plat.
 

 On 16 June 2014, the Board reconvened its special meeting from 10 June 2014. At the meeting, the Board voted 3-2 to reduce the level of Spring Lake by three inches and to monitor the effect on the lake which Spring Lake drained into. On 1 July 2014, at its regular meeting, the Board voted to reduce the lake level an additional two and a half inches to meet the recommendation of SunGate. On 30 July 2014, the elbows were removed.
 

 Mr. and Mrs. Wilkie filed this action alleging inverse condemnation by the City on 23 May 2014, prior to the removal of the elbows. On 20 April 2015, the City moved to dismiss the complaint, or in the alternative for the trial court to determine all issues other than damages pursuant to N.C. Gen. Stat. § 40A-47. The City simultaneously filed a request for the trial court to consider matters outside the pleadings and to treat the motion to dismiss as a motion for summary judgment. On 4 May 2015, the City answered the complaint. The trial court denied the City's motion for summary judgment by order entered 1 July 2015. On 5 November 2015, the trial court entered an order purportedly determining
 
 *61
 
 all of the issues other than damages. The trial court concluded in its order that:
 

 1. The actions taken by the City as set forth in the findings of fact amount to a taking of the Wilkies' property without just compensation ... under the provisions of Chapter 40A of the North Carolina General Statutes and the 5
 
 th
 
 and 14
 
 th
 
 Amendments to the Constitution of the United States of America.
 

 ....
 

 4. The City's intention in maintaining Spring Lake at elevated levels was for the benefit of private land owners abutting the Lake. Thus, the City's taking of the Wilkies' property was for a private use.
 

 ....
 

 9. The City has taken the Wilkies' property by inverse condemnation.
 

 10. The Wilkies have proven their [N.C. Gen. Stat] §[ ]40A-51 cause of action.
 

 *520
 
 11. The City, by inverse condemnation, took a temporary easement interest in 1,120 square feet of the Wilkies' property for a period of 1 year and 20 days and has also taken a portion of the topsoil and centipede grass that was located on the same 1,120 square feet without adequate notice or compensation.
 

 The trial court then ordered a trial to be conducted to determine the damages to which the Wilkies were entitled for the City's taking of the easement in the Wilkies' property. The City filed a notice of appeal from the trial court's order, which was received by the Brunswick County Clerk's office prior to 7 December 2015, and entered on 8 December 2015.
 

 Discussion
 

 On appeal, the City argues that the trial court erred in concluding that the City took the Wilkies' property by inverse condemnation. We agree.
 

 1. Interlocutory nature of the appeal
 

 Initially, we note that this appeal is interlocutory. "Generally, there is no right of immediate appeal from interlocutory orders and judgments."
 
 Goldston v. Am. Motors Corp.
 
 ,
 
 326 N.C. 723
 
 , 725,
 
 392 S.E.2d 735
 
 , 736 (1990). "If a party attempts to appeal from an interlocutory order without showing that the order in question is immediately appealable, we are required to dismiss that party's appeal on jurisdictional grounds."
 
 Hamilton v. Mortg. Info. Servs., Inc.
 
 ,
 
 212 N.C.App. 73
 
 , 77,
 
 711 S.E.2d 185
 
 , 189 (2011). "An interlocutory order is one made during the pendency of an action, which does not dispose of the case, but leaves it for further action by the trial court in order to settle and determine the entire controversy."
 
 Veazey v. City of Durham
 
 ,
 
 231 N.C. 357
 
 , 361-62,
 
 57 S.E.2d 377
 
 , 381 (citations omitted),
 
 reh'g denied
 
 ,
 
 232 N.C. 744
 
 ,
 
 59 S.E.2d 429
 
 (1950).
 

 "[I]mmediate appeal is available from an interlocutory order or judgment which affects a substantial right."
 
 Sharpe v. Worland
 
 ,
 
 351 N.C. 159
 
 , 162,
 
 522 S.E.2d 577
 
 , 579 (1999) (citation and internal quotation marks omitted). Orders issued pursuant to N.C. Gen. Stat. § 40A-47 concerning title and the area of property taken affect a substantial right and are immediately appealable.
 
 Mecklenburg County v. Simply Fashion Stores, Ltd.
 
 ,
 
 208 N.C.App. 664
 
 , 667,
 
 704 S.E.2d 48
 
 , 51 (2010) (citations omitted);
 
 see also
 

 Town of Apex v. Whitehurst
 
 ,
 
 213 N.C.App. 579
 
 , 582-83,
 
 712 S.E.2d 898
 
 , 901 (2011) ("[O]rders from a condemnation hearing concerning title and area taken are vital preliminary issues that must
 
 *521
 
 be immediately appealed pursuant to N.C. [Gen. Stat.] § 1-277, which permits interlocutory appeals of determinations affecting substantial rights." (citation omitted)).
 

 The trial court's 5 November 2015 order is interlocutory, because it does not dispose of all of the issues in the case. The trial court specifically did not determine the issue of damages. However, because the order was issued pursuant to N.C. Gen. Stat. § 40A-47 and addressed the area taken by the City, the order affects a substantial right and is properly before this Court.
 

 2. Standard of review
 

 At a hearing conducted pursuant to N.C. Gen. Stat. § 40A-47, the trial court determines all issues other than compensation. § 40A-47. A review of North Carolina case
 
 *62
 
 law reveals two standards which this Court has used in review of orders issued pursuant to section 40A-47.
 

 In
 
 Town of Matthews v. Wright
 
 , this Court stated:
 

 Our Supreme Court has held
 
 de novo
 
 review is appropriate when reviewing decisions of the trial court on all issues other than damages in eminent domain cases.
 
 See
 

 Piedmont Triad Airport Auth. v. Urbine
 
 ,
 
 354 N.C. 336
 
 , 338,
 
 554 S.E.2d 331
 
 , 332 (2001). We review eminent domain issues
 
 de novo
 
 because of the well-settled principle that
 
 de novo
 
 review is required where constitutional rights are implicated.
 
 See
 
 id.
 

 240 N.C. App. 584
 
 , 591,
 
 771 S.E.2d 328
 
 , 333 (2015).
 

 In contrast, in
 
 L&S Water Power, Inc. v. Piedmont Triad Reg'l Water Auth.
 
 , the Court stated:
 

 This Court is bound by factual findings of the trial court, as long as the findings are supported by competent evidence.
 
 City of Winston-Salem v. Ferrell
 
 ,
 
 79 N.C.App. 103
 
 , 111,
 
 338 S.E.2d 794
 
 , 799 (1986). We review the trial court's conclusions of law
 
 de novo
 
 on appeal.
 
 Carolina Power & Light Co. v. City of Asheville
 
 ,
 
 358 N.C. 512
 
 , 517,
 
 597 S.E.2d 717
 
 , 721 (2004).
 

 211 N.C.App. 148
 
 , 151,
 
 712 S.E.2d 146
 
 , 149 (2011),
 
 disc. review improvidently allowed
 
 ,
 
 366 N.C. 324
 
 ,
 
 736 S.E.2d 484
 
 (2012).
 

 The issue on appeal is whether the trial court's legal conclusion that the City took the Wilkies' property by inverse condemnation was error.
 

 *522
 
 Thus, regardless of the standard used, we review this legal conclusion
 
 de novo
 
 .
 

 3. Inverse condemnation
 

 The City argues that the trial court erred in concluding that the City took the Wilkies' property by inverse condemnation for several reasons. The City's first argument is that the trial court erred, because there can be no inverse condemnation when property is not taken for a public use. We agree.
 

 "Inverse condemnation is a device which forces a governmental body to exercise its power of condemnation, even though it may have no desire to do so."
 
 City of Greensboro v. Pearce
 
 ,
 
 121 N.C.App. 582
 
 , 587,
 
 468 S.E.2d 416
 
 , 420 (1996) (citation and internal quotation marks omitted). The North Carolina General Statutes provide the remedy of an inverse condemnation action "[i]f property has been taken by an act or omission of a condemnor listed in [N.C. Gen. Stat §] 40A-3(b) or (c) and no complaint containing a declaration of taking has been filed." N.C. Gen. Stat § 40A-51 (2015). Section 40A-3(b) states:
 

 (b) Local Public Condemnors-Standard Provision.-For the public use or benefit, the governing body of each municipality or county shall possess the power of eminent domain and may acquire by purchase, gift or condemnation any property, either inside or outside its boundaries, for the following purposes.
 

 (1) Opening, widening, extending, or improving roads, streets, alleys, and sidewalks. The authority contained in this subsection is in addition to the authority to acquire rights-of-way for streets, sidewalks and highways under Article 9 of Chapter 136. The provisions of this subdivision (1) shall not apply to counties.
 

 (2) Establishing, extending, enlarging, or improving any of the public enterprises listed in G.S. 160A-311 for cities, or G.S. 153A-274 for counties.
 

 (3) Establishing, enlarging, or improving parks, playgrounds, and other recreational facilities.
 

 (4) Establishing, extending, enlarging, or improving storm sewer and drainage systems and works, or sewer and septic tank lines and systems.
 

 *523
 
 (5) Establishing, enlarging, or improving hospital facilities, cemeteries, or library facilities.
 

 (6) Constructing, enlarging, or improving city halls, fire stations, office buildings, courthouse jails and other buildings for use by any department, board, commission or agency.
 

 (7) Establishing drainage programs and programs to prevent obstructions to the natural flow of streams, creeks and natural water channels or improving drainage facilities.
 

 *63
 
 The authority contained in this subdivision is in addition to any authority contained in Chapter 156.
 

 (8) Acquiring designated historic properties, designated as such before October 1, 1989, or acquiring a designated landmark designated as such on or after October 1, 1989, for which an application has been made for a certificate of appropriateness for demolition, in pursuance of the purposes of G.S. 160A-399.3, Chapter 160A, Article 19, Part 3B, effective until October 1, 1989, or G.S. 160A-400.14, whichever is appropriate.
 

 (9) Opening, widening, extending, or improving public wharves.
 

 The board of education of any municipality or county or a combined board may exercise the power of eminent domain under this Chapter for purposes authorized by Chapter 115C of the General Statutes.
 

 The power of eminent domain shall be exercised by local public condemnors under the procedures of Article 3 of this Chapter.
 

 N.C. Gen. Stat. § 40A-3(b) (2015). Section 40A-3 sets out "the exclusive uses for which the authority to exercise the power of eminent domain is granted to ... local public condemnors." N.C. Gen. Stat. § 40A-1(a) (2015). An exercise of the power of eminent domain occurs when "the government takes property
 
 for public use
 
 because such action is advantageous or beneficial to the public."
 
 Kirby v. N.C. Dep't of Transp.
 
 ,
 
 368 N.C. 847
 
 , 854,
 
 786 S.E.2d 919
 
 , 924 (2016) (citation omitted; emphasis omitted and added). "Where the language of a statute is clear and unambiguous, there is no room for judicial construction and the courts must construe the statute using its plain meaning."
 
 Burgess v. Your House of Raleigh, Inc.
 
 ,
 
 326 N.C. 205
 
 , 209,
 
 388 S.E.2d 134
 
 , 136 (1990) (citation omitted).
 

 *524
 
 The plain language of section 40A-51 defines when the remedy of an inverse condemnation action is available against a public condemnor. The statute limits the availability of this remedy to instances in which property is taken by a condemnor pursuant to one of the enumerated acts or omissions in section 40A-3(b). § 40A-51. Section 40A-3(b) begins by stating that the governing body of a municipality possesses the power of eminent domain to perform each of its enumerated acts "[f]or the public use or benefit." § 40A-3(b) ;
 
 see also
 

 Stout v. City of Durham
 
 ,
 
 121 N.C.App. 716
 
 , 718,
 
 468 S.E.2d 254
 
 , 256-67,
 
 disc. review granted
 
 ,
 
 344 N.C. 637
 
 ,
 
 477 S.E.2d 54
 
 (1996),
 
 motion for disc. review withdrawn
 
 ,
 
 345 N.C. 353
 
 ,
 
 484 S.E.2d 93
 
 (1997). Thus, the plain language of section 40A-51 limits its application to action taken by a municipality "for the public use or benefit." As a result, there is no remedy of inverse condemnation under the statute when property is not taken "for the public use or benefit."
 

 The trial court concluded that "the City's taking of the Wilkies' property was for a private use," because it was intended to benefit the property owners whose lots bordered Spring Lake.
 
 [2]
 
 Applying the plain language of section 40A-51, there is no remedy through an inverse condemnation action for the Wilkies, because their property was not taken "for the public use or benefit." Therefore, we reverse the trial court's order concluding that the City took the Wilkies' property by inverse condemnation. Because we reverse the trial court's order based on the City's first argument, it is unnecessary for us to reach the City's remaining arguments that the trial court erred.
 

 However, this holding does not dispose of the case. North Carolina case law is clear that an aggrieved person has a direct claim under the North Carolina Constitution for violation of his or her constitutional rights when no adequate state law remedy exists.
 
 See
 

 *64
 

 Corum v. Univ. of N.C.
 
 ,
 
 330 N.C. 761
 
 , 782,
 
 413 S.E.2d 276
 
 , 289 ("[I]n the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under our Constitution."),
 
 reh'g denied
 
 ,
 
 331 N.C. 558
 
 ,
 
 418 S.E.2d 664
 
 ,
 
 cert. denied
 
 ,
 
 506 U.S. 985
 
 ,
 
 113 S.Ct. 493
 
 ,
 
 121 L.Ed.2d 431
 
 (1992) ;
 
 *525
 

 Midgett v. N.C. State Highway Comm'n
 
 ,
 
 260 N.C. 241
 
 ,
 
 132 S.E.2d 599
 
 (1963) (holding that the plaintiff could directly pursue a claim for just compensation under the Law of the Land clause of the North Carolina Constitution where the statutory inverse condemnation remedy, which was ordinarily exclusive, was not adequate under the facts of the case),
 
 overruled in part on other grounds
 
 ,
 
 Lea Co. v. N.C. Bd. of Transp.
 
 ,
 
 308 N.C. 603
 
 ,
 
 304 S.E.2d 164
 
 (1983) ;
 
 see also
 

 Bigelow v. Town of Chapel Hill
 
 ,
 
 227 N.C.App. 1
 
 , 14-15,
 
 745 S.E.2d 316
 
 , 326-27 (applying the holding in
 
 Corum
 
 and reversing the trial court's dismissal of the plaintiffs' claims under the North Carolina Constitution against the Town of Chapel Hill),
 
 disc. review denied
 
 ,
 
 367 N.C. 223
 
 ,
 
 747 S.E.2d 543
 
 (2013) ;
 
 Patterson v. City of Gastonia
 
 ,
 
 220 N.C.App. 233
 
 , 239,
 
 725 S.E.2d 82
 
 , 88 (applying the holding in
 
 Corum
 
 and reversing the trial court's dismissal of the plaintiffs' claims under the North Carolina Constitution against the City of Gastonia),
 
 disc. review denied
 
 ,
 
 366 N.C. 406
 
 ,
 
 759 S.E.2d 82
 
 (2012).
 

 Mr. and Mrs. Wilkie alleged in their complaint that "the City ... caused the [Wilkies] damages, [took] property belonging to the [Wilkies] and affected the [Wilkies]' property rights in violation of their Constitutional rights contained within the 5
 
 th
 
 and 14
 
 th
 
 Amendments to the Constitution of the United States of America as well as Article 1, Sec. 19, of the Constitution of the State of North Carolina." The trial court's order did not address the Wilkies' claim under the North Carolina Constitution. Accordingly, we remand this matter to the trial court for further proceedings consistent with this opinion.
 

 REVERSED AND REMANDED.
 

 Judges ELMORE and DIETZ concur.
 

 [1]
 

 Section 40A-47 provides that a trial judge in a condemnation proceeding, upon motion of either party and ten days' notice, shall determine "all issues raised by the pleadings other than the issue of compensation." N.C. Gen. Stat. § 40A-47 (2015).
 

 [2]
 

 The Wilkies argue that the City took their property for a public use despite urging this Court to affirm the trial court's order. To the extent that this argument was intended as a challenge to the trial court's legal conclusion that the City took the Wilkies' property for a private use, all of the evidence from the Board's meeting minutes supports finding of fact 8 and the legal conclusion that the Board took action to increase the lake level in response to the petition from the group of private landowners. There is no evidence that the Board considered any benefit to the public in its discussions about the lake level.