Gurkin v. Sofield, 2020 NCBC 31.

STATE OF NORTH CAROLINA

COUNTY OF COLUMBUS

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
FILE NO. 19-CVS-419

LISA GURKIN AS EXECUTRIX FOR
THE ESTATE OF ROBERT GURKIN;
and THE ESTATE OF ROBERT
GURKIN,

               Plaintiff,

     v.

ROBERT THOMAS SOFIELD,
JR.; EQUITY INVESTMENTS
ASSOCIATES, LLC; SOUTHEAST
PROPERTY ACQUISITIONS,
LLC; FKA APPALACHIAN
PROPERTY HOLDINGS, LLC;
CAROLINA FORESTS, LLC;
APPALACHIAN PROPERTY
HOLDINGS, LLC; PINE FOREST
DEVELOPMENT COMPANY,
LLC; SPG PROPERTY, LLC; GPS
HOLDINGS, LLC; SOFIELD
HOLDINGS MANAGEMENT,
INC.; RTS-DMC 1, LLC; HS
GREEN FAMILY IRREVOCABLE
TRUST; HS PORTANTE FAMILY
IRREVOCABLE TRUST; and RT
SOFIELD III IRREVOCABLE
TRUST,

               Defendants.

**ORDER AND OPINION ON
MOTIONS FOR JUDGMENT ON
THE PLEADINGS**

THIS MATTER comes before the Court on Defendants Robert Thomas Sofield,

Jr.; RT Sofield III Irrevocable Trust; Sofield Holdings Management, Inc.; SPG

Property, LLC; Pine Forest Development Company, LLC; HS Portante Family

Irrevocable Trust; HS Green Family Irrevocable Trust; and GPS Holdings, LLC's

(collectively, the "Sofield-Related Defendants") Motion for Judgment on the Pleadings ("Sofield Motion," ECF No. 48), and Defendants Southeast Property Acquisitions, LLC; Equity Investments Associates, LLC; and Carolina Forests, LLC's (collectively, the "Southeast Defendants") Motion for Judgment on the Pleadings ("Southeast Motion," ECF No. 50) (collectively, the Sofield Motion and the Southeast Motion are the "Motions").[1]

THE COURT, having considered the Motions, the briefs in support of and in opposition to the Motions, the arguments of counsel at the hearing, the pleadings at issue, and other appropriate matters of record, CONCLUDES that the Sofield Motion should be GRANTED, in part, and DENIED, in part, and the Southeast Motion should be GRANTED, for the reasons set forth below.

*Hall & Green, LLP, by John Green and Caroline Rawl, and Wright, Worley, Pope, Ekster & Moss, PLLC, by Dennis Worley and Alexander Hall for Plaintiff Lisa Gurkin as Executrix for the Estate of Robert Gurkin and the Estate of Robert Gurkin.*

*Poyner Spruill LLP, by Andrew Erteschik, Emily Meeker, Colin McGrath, N. Cosmos Zinkow, and Stephanie Gumm for the Sofield-Related Defendants.*

*Womble Bond Dickinson (US) LLP, by Chris Jones and Jonathon Townsend for the Southeast Defendants.*

McGuire, Judge.

---

[1] On October 10, 2019, Plaintiff filed a Notice of Voluntary Dismissal Without Prejudice, dismissing, without prejudice, all of Plaintiff's claims for relief against Defendant RTS-DMC 1, LLC ("RTS-DMC"). (ECF No. 78.)  Accordingly, on October 11, 2019, the Court ordered that RTS-DMC's Motion for Judgment on the Pleadings (ECF No. 52) was DENIED as MOOT.  (ECF No. 81.)

# I.    FACTS[2] AND PROCEDURAL BACKGROUND

1.    The original complaint lists Lisa Gurkin as Attorney in Fact for Robert Gurkin, and Robert Gurkin by and through his Attorney in Fact Lisa Gurkin, as Plaintiffs in this matter.  On May 31, 2019, Robert Gurkin ("Gurkin") passed away, and Plaintiff Lisa Gurkin was appointed as Executrix of the Estate of Robert Gurkin. Plaintiff moved to substitute Lisa Gurkin as Executrix of the Estate of Robert Gurkin and the Estate of Robert Gurkin as named Plaintiff, and the Court granted that motion.  (Order on Mot. to Substitute Party Pls., ECF No. 35.)  Lisa Gurkin is a citizen and resident of Columbus County, North Carolina.

2.    Defendant Robert Thomas Sofield Jr. ("Sofield") is a citizen and resident of Watauga County, North Carolina.

3.    Defendant Equity Investments Associates, LLC ("Equity") is a North Carolina limited liability company with its principal place of business in Alpharetta, Georgia.

4.    Defendant Southeast Property Acquisitions, LLC ("Southeast") is a Nevada limited liability company that at one point had a principal place of business in Watauga County, North Carolina.  Southeast now has a principal place of business in Reno, Nevada.  Plaintiff asserts that Southeast was formerly known as Defendant Appalachian Property Holdings, LLC ("Appalachian").  Appalachian is a dissolved

---

[2] The facts cited herein are drawn from the Complaint and documents referred to therein that are attached to the Complaint and Defendants' Answers.  ("Complaint," ECF No. 4); *Davis v. Durham Mental Health/Dev. Disabilities/Substance Abuse Area Auth.*, 165 N.C. App. 100, 104, 598 S.E.2d 237, 240 (2004) (stating that a trial court can consider the pleadings and any exhibits which are attached and incorporated into the pleadings in ruling on a 12(c) motion).

North Carolina limited liability company that had its principal place of business in Watauga County, North Carolina.

5. Defendant Carolina Forests, LLC ("Carolina Forests") is a North Carolina limited liability company with its principal place of business in Watauga County, North Carolina. Carolina Forests was once solely owned by Gurkin, but the sole member is now Equity.

6. Defendant Pine Forest Development Company, LLC ("Pine Forest") is a North Carolina limited liability company with its principal place of business in Watauga County, North Carolina. Defendant Sofield Holdings Management, Inc. was the organizer of Pine Forest, and is a "member manager" of Pine Forest.

7. Defendant SPG Property, LLC ("SPG") is a North Carolina limited liability company with its principal place of business in Watauga County, North Carolina.

8. Defendant GPS Holdings, LLC ("GPS") is a North Carolina limited liability company with its principal place of business in Watauga County, North Carolina.

9. Defendant Sofield Holdings Management, Inc. ("Sofield Management") is a North Carolina limited liability company with its principal place of business in Watauga County, North Carolina. Sofield Management is the manager of GPS. Sofield is the President of Sofield Management, his wife Deborah Clark Sofield is the Vice President, and his daughter Heather Sofield Greene is the Secretary.

10.     Defendants HS Green Family Irrevocable Trust ("Green Trust"), HS Portante Family Irrevocable Trust ("Portante Trust"), and RT Sofield III Irrevocable Trust ("RTS III Trust") are trusts created and set up by Sofield for the benefit of his family and are the members of GPS.

11.     Plaintiff alleges that the various Defendant entities are:

> dominated and controlled by defendant Sofield by various interlocking entities, agreements and other devices not all of which are known to plaintiffs at this time and have all at some point in some fashion acted in concert and under dominion and control of defendant Sofield to accomplish the results as described [in the Complaint]. Due to the dominance and control by defendant Sofield said entities have no separate existence of their own and their acts and omissions are those of Sofield himself.

(ECF No. 4, at ¶ 18.)

12.     Furthermore, Plaintiff alleges that: Southeast is "controlled by defendant Sofield"; "defendant Sofield retains almost complete control over defendants Equity, Southeast, Carolina Forests and Pine Forest"; and:

> At all times complained of, defendant Sofield has controlled defendants Equity, Southeast, Appalachian, Carolina Forests, Pine Forest, SPG Property, GPS Holdings, Sofield Management, RTS-DMC, HS Green Family Trust, HS Portante Trust and RTS III Trust and was acting as agent of each, all of which have acted in concert with each other at the direction of defendant Sofield and aforesaid defendants are liable for the actions of the defendant Sofield as described [in the Complaint]. As they acted in concert and in a common plan and scheme each is liable for the actions of the other.

(*Id.* at ¶¶ 46–48; *see also id.* at ¶¶ 59, 67, 73.)

## A.    Gurkin Forms Equity and Carolina Forests

13.    Gurkin "had for years been experienced and knowledgeable in the land and timber business in southeastern North Carolina and northeastern South Carolina." (*Id.* at ¶ 20.)  He "had acquired significant expertise and reputation for dealing in such business, all of which resulted in significant value for his advice, counsel, name and business acumen and reputation." (*Id.*)

14.    Gurkin formed Equity on or around July 9, 2001, with the intent of purchasing land to hold for sale to developers. (*Id.* at ¶ 19.)  At the time of formation, Gurkin and Wilbur Ward ("Ward") each owned one-half interest in Equity. (*Id.*)

15.    On October 14, 2002, Gurkin, Ward, and Ward's wife, Joyce Ward ("Joyce"), entered into a written Operating Agreement of Equity Investment Associates, LLC ("Operating Agreement"). (Sofield-Related Defendants' Answer, ECF No. 6, at Ex. A.)  Under the Operating Agreement, Gurkin held a 50% membership interest in Equity, and Ward and Joyce jointly owned the other 50% membership interest. (*Id.* at pp. 26–27.)  The Operating Agreement named Gurkin and Ward as Managers of Equity and required that all company decisions be by consent of the majority of the Managers. (*Id.* at § 3.1.)

16.    Around May 2, 2003, Gurkin formed Carolina Forests with the same purpose as Equity. (ECF No. 4, at ¶ 19.)  Gurkin owned 100% of Carolina Forests until 2014. (*Id.*)  Equity and Carolina Forests together held a 2,118 acre parcel of land—1,930 acres owned by Equity and 188 acres by Carolina Forests—located in Brunswick County, North Carolina "along the north side of Highway 211, west of

Southport, North Carolina, and running to Midway Road on the west and then extending north along Midway Road." (*Id.*)  The 188 acre parcel owned by Carolina Forests was the most valuable acreage of the property.  (*Id.* at ¶ 31.)

**B.    The 2014 Equity Transaction**

17.    The 1,930 acres owned by Equity was encumbered by a bank loan owed to BB&T.  (*Id.* at ¶ 23.)  In 2014, BB&T informed Gurkin and Ward that the bank was withdrawing its financing.  (*Id.* at ¶ 25.)  In response, Gurkin began searching for an investor to provide financing to pay the loan owed to BB&T in full.  (*Id.*)

18.    A friend introduced Gurkin to Sofield, who was involved in other real estate businesses and was immediately interested in investing with Gurkin.  (*Id.* at ¶ 26.)

19.    On February 19, 2014, Gurkin, Ward, and SPG—a company that Plaintiff alleges Sofield controls—entered into the Agreement and Second Amendment to Operating Agreement of Equity to provide the necessary funding for Equity (the "2014 Equity Transaction").  (*Id.* at ¶ 28; ECF No. 6, at Ex. A.)  Sofield signed the agreement, not in his personal capacity, but in his role as President of Sofield Management, which is the manager of SPG.  (ECF No. 6, at Ex. A.)  As part of the 2014 Equity Transaction, Ward and Joyce assigned their 50% interest in Equity to SPG for $3,300,000.00 (ECF No. 4, at ¶ 28), and Gurkin assigned half of his interest (25%) to SPG in exchange for SPG paying the outstanding bank loan with BB&T of approximately $2,200,000.00.  (*Id.*; Assignment of LLC Membership Interest, ECF No. 6, at Ex. B.)

20.     The Agreement and Second Amendment to Operating Agreement of Equity amended the original Operating Agreement to make Gurkin and Sofield the Managers of Equity (ECF No. 6 at Ex. A, pp. 2–3), but also added the following language to the Operating Agreement:

> Notwithstanding the foregoing or any other provision of the Operating Agreement to the contrary, if at any time there is more than one Manager of the Company then serving or acting and ROBERT THOMAS SOFIELD, JR. or any successor to ROBERT THOMAS SOFIELD, JR. appointed by Member SPG Property, LLC is then serving or acting as a Manager, then as to all decisions with respect to the management of the business and the affairs of the Company within the authority of the Managers under this Article III and this Agreement (i) all such decisions shall require the consent of ROBERT THOMAS SOFIELD, JR. or his successor taken at a meeting or evidenced by a written consent and (ii) the action or decision of ROBERT THOMAS SOFIELD, JR. or his successor *shall be binding on the Company without the consent or joinder or any other Manager or Member*.

(ECF No. 6 at Ex. A, pp. 4–5 (emphasis added).)  Nevertheless, Plaintiff alleges that Gurkin and Sofield "would consult and agree on all major decisions and would essentially act as partners." (ECF No. 4, at ¶ 28.)

21.     After the 2014 Equity Transaction, Plaintiff claims that Sofield owned 75% of Equity and Gurkin owned 25%, and that Sofield, as the majority member of Equity, owed a fiduciary duty to Gurkin as the minority member.  (*Id.* at ¶¶ 28, 56.) The Assignment of LLC Membership Interest Agreement and amendments to the Operating Agreement, however, show that Gurkin assigned his interest to SPG, not Sofield, and that SPG became the majority member of Equity. (ECF No. 6, at Exs. A, B.)  Gurkin alleges that Sofield told him that "he should not worry about the 75/25

split and that as soon as he, defendant Sofield got his money he had put into the project out, then they would split the remainder '50/50.'" (ECF No. 4, at ¶ 28.) The parties agreed that Gurkin would handle the selling of the property, Sofield would handle the finances, they would consult and agree on all major decisions, and would act as partners. (*Id.*)

22. Additionally, Plaintiff alleges that "Sofield insisted that the 188 acres owned by Carolina Forests, which was 100% owned by [Gurkin], and unencumbered, be transferred into [ ] Equity. The 188 acres consisted of valuable road frontage along Highway 211 and Midway Road and was the most valuable acreage of the property. At [ ] Sofield's insistence, [ ] Carolina Forests became controlled by [ ] Sofield and became part of [ ] Equity, the exact means which that was accomplished being unknown to [ ] [Gurkin]. Such transaction greatly increased the value of [ ] Sofield's interest. Later on[,] Carolina Forests was described as a 'subsidiary' of [ ] Equity." (*Id.* at ¶ 31.)

23. Plaintiff further alleges that "[n]o documents or other paperwork involved in the transaction . . . were provided by defendant Sofield to plaintiff [Gurkin], and [Gurkin] relied on Sofield's word, oral agreements and representations made by him. Defendant Sofield provided for the lawyers involved in the transaction, and those lawyers were unknown by plaintiff [Gurkin] and such lawyers were compensated by and acting on behalf of defendant Sofield." (*Id.* at ¶ 32.)

## C.     The 2016 RTS-DMC Transaction

24.    On November 1, 2016, at Sofield's direction, Equity transferred a valuable 1.32 acre parcel of land to SPG.  SPG then conveyed the 1.32 acre tract of land to RTS-DMC, a North Carolina limited liability company that Plaintiff alleges is controlled by Sofield (the "2016 RTS-DMC Transaction").  (*Id.* at ¶ 34.)

25.    Although Plaintiff alleges that Gurkin did not know of the 2016 RTS-DMC Transaction until it was completed (*see id.* at ¶ 34), Gurkin signed a Unanimous Written Consent of the Members and Managers of Equity on October 24, 2016, which authorized the 2016 RTS-DMC Transaction.  (Unanimous Written Consent, ECF No. 29.1.)[3]  The Unanimous Written Consent states that the Members and Managers of Equity consent to a number of resolutions, including that: "SPG desires to own a certain 1.32 acre parcel of the LLC Brunswick County Property" for "purposes unrelated to Company purposes"; "SPG intends to or has entered into certain agreements with an unrelated party for the future development and leasing of the SPG Parcel"; and "the net fair market value of the SPG Parcel after all SPG Parcel Improvements have been made shall be $200,000."  (*Id.*)

## D.     The 2017 Pine Forest Transaction

26.    In June of 2016, Equity filed a certificate of doing business under the name Pine Forest Plantation to develop a multi-use property owned by Equity located along Highway 211 across from the highly successful large development known as St.

---

[3] The Unanimous Written Consent was filed by RTS-DMC as Exhibit 1 to its Answer.  (ECF Nos. 27, 29.)

James Plantation, which was developed by other parties. (ECF No. 4, at ¶ 35.) This property was to be developed for both residential and commercial use. (*Id.* at ¶ 36.)

27.    Beginning in mid-2017, Gurkin began experiencing medical issues that resulted in a cancer diagnosis. (*Id.* at ¶ 37.) Plaintiff alleges that Gurkin's course of treatment for cancer, including many chemotherapy treatments, left him in a "weakened and vulnerable state, both mentally and physically," and that his disease quickly progressed through 2018. (*Id.* at ¶¶ 37–39.) Additionally, Gurkin began "to suffer from severe anxiety and depression." (*Id.* at ¶ 39.)

28.    In late December 2017, during Gurkin's course of treatment, Equity conveyed an approximately 183.2 acre tract to Pine Forest for $794,000 in order to facilitate the Pine Forest Plantation development (the "2017 Pine Forest Transaction"). (*Id.* at ¶¶ 35–36.) The tract was part of the property formerly exclusively owned by Gurkin through Carolina Forests. (*Id.* at ¶ 36.) Plaintiff alleges that Gurkin objected to the 2017 Pine Forest Transaction but was told by Sofield that "your part is over." (*Id.* at ¶ 36.)

29.    When Equity applied for development permits for Phase 1 of the Pine Forest Plantation development, the applicants were listed as "R. Thomas Sofield and Equity Investment Associates." (*Id.* at ¶ 50.) On the application for permits for Phase II, submitted on October 10, 2018, only "R. Thomas Sofield" was listed as an applicant. (*Id.* at ¶ 51.)

E.    **The 2018 Southeast Transaction**

30.    In October 2018, Sofield traveled to Brunswick County to meet with Gurkin regarding the sale of his interest in Equity.  Plaintiff alleges that Gurkin was in a weakened mental and physical condition at this time.  (*Id.* at ¶ 40.)

31.    Plaintiff asserts that upon Sofield's arrival, Sofield told Gurkin that he was "getting out" and that Gurkin had to also sell his interest in Equity.  (*Id.*)  Gurkin and Sofield met with a lawyer at the office of St. James Plantation, where Sofield presented Gurkin with multiple documents.  One of these documents was the Membership Interest Purchase Agreement (ECF No. 4, at Ex. B), which Sofield told Gurkin that "he had to sign or 'they' would 'tear him apart' and would 'take everything he had,'" and that "'they', referring to defendant Southeast, were the only possible buyers." (*Id.* at ¶¶ 40, 42.)  The Complaint alleges that "[t]his was all without revealing to [Gurkin] that [Sofield] was in fact the purchaser, or at the very least controlled the purchasing entity" Southeast.  (*Id.* at ¶ 42.)

32.    Under the Membership Interest Purchase Agreement, Gurkin would sell his 25% interest and SPG would sell a 55% interest in Equity to a third party, Southeast (the "2018 Southeast Transaction").  (*Id.* at ¶ 40, Ex. B.)  The Membership Interest Purchase Agreement stated that the value of the property owned by Equity and Carolina Forests was $15 million.  (*Id.*)  Of this $15 million, Southeast would pay to Gurkin and SPG a total of $12 million.  (*Id.*)  The $12 million purchase price was to be allocated as follows: $9,416,310.11 to SPG and $2,583,689.89 to Gurkin.  (*Id.*)  Sofield told Gurkin that the "sum of $2,583,689.89 was the best [Gurkin] could obtain

from the property." (*Id.* at ¶ 97.) Plaintiff alleges that after the 2018 Southeast Transaction, Southeast owned a 66.25% interest in Equity and SPG retained a 33.75% interest. (*Id.* at ¶ 47.) The Membership Interest Purchase Agreement states, however, that SPG only retained a 20% membership interest in Equity after the transaction. (*Id.* at Ex. B, § 1(c).)

33. Plaintiff alleges that Gurkin objected to the 2018 Southeast Transaction because the proposed purchase price was "grossly insufficient" and he believed that a better sale would occur at a greater value in the future. (*Id.* at ¶ 42.)

34. Additionally, Plaintiff alleges that, "in [Gurkin's] weakened condition due to cancer and chemotherapy," he was "in no position to make rational business decisions or to know what he was doing regarding a complicated transaction of such importance" and that Sofield was aware of Gurkin's "weakened and vulnerable state." (*Id.*) Nevertheless, Gurkin signed the Membership Interest Purchase Agreement on October 3, 2018. (*Id.*)

35. Gurkin did not receive the $2,583,689.89 for his execution of the Membership Interest Purchase Agreement, as Sofield deducted from Gurkin's payment the interest Sofield claimed was owed by Gurkin for the BB&T loan that Sofield paid on behalf of Equity. (*Id.* at ¶ 45.)

36. Plaintiff alleges that "Sofield retains almost complete control over defendants Equity, Southeast, Carolina Forests and Pine Forest and the development of the property . . . and the [2018 Southeast Transaction] . . . was nothing more than a sham devised to deprive [Gurkin] of his rightful interest in defendants Equity and

Carolina Forests and to vest such interest in defendant Sofield, either acting for himself, or entities controlled by him or his family." (*Id.* at ¶ 47.)

**F.      Relevant Procedural History**

37.      Plaintiff initiated this action by filing the Complaint on April 8, 2019. (ECF No. 4.)  In the Complaint, Plaintiff alleges claims against Defendants for: breach of fiduciary duty (First Claim); lack of mental capacity (Second Claim); duress (Third Claim); undue influence (Fourth Claim); fraud and misrepresentation (Fifth Claim); constructive trust (Sixth Claim); and unfair or deceptive trade practices in violation of N.C.G.S. § 75-1.1 ("UDTPA") (Seventh Claim).  (ECF No. 4, at ¶¶ 55–111.)  On September 3, 2019, Plaintiff filed a Notice of Voluntary Dismissal, dismissing, with prejudice, its Sixth Claim for a constructive trust.  (ECF No. 59.)  As it relates to its remaining claims, Plaintiff is seeking only monetary damages—Plaintiff is not seeking to void or rescind any of the four transactions.  (ECF No. 4, at ¶¶ 73–74.)

38.      On May 9, 2019, this case was designated to the North Carolina Business Court and assigned to the undersigned.  (Designation Order, ECF No. 1; Assignment Order, ECF No. 2.)

39.      The Sofield-Related Defendants filed an Answer, Affirmative Defenses, and Counterclaims on May 8, 2019.  (ECF No. 6.)  The Southeast Defendants filed an Answer and Counterclaims the same day.  (ECF No. 7.)

40.      On August 16, 2019, the Sofield-Related Defendants filed the Sofield Motion.  The Sofield-Related Defendants simultaneously filed a brief in support of

the Sofield Motion. (ECF No. 49.) The same day, the Southeast Defendants filed the Southeast Motion, and a brief in support of the Southeast Motion. (ECF No. 51.)

41.    Plaintiff filed memoranda in opposition to the Sofield Motion (ECF No. 71) and the Southeast Motion (ECF No. 72) on September 27, 2019. On October 10, 2019, the Sofield-Related Defendants filed a reply brief in support of the Sofield Motion (ECF No. 79) and the Southeast Defendants filed a reply brief in support of the Southeast Motion (ECF No. 80).

42.    The Court held a hearing on the Motions at which counsel for the parties made oral arguments.

43.    The Motions have been fully briefed and argued, and they are now ripe for determination.

II.    ANALYSIS

A.    **Standard of Review**

44.    "A motion for judgment on the pleadings is the proper procedure when all the material allegations of fact are admitted in the pleadings and only questions of law remain. When the pleadings do not resolve all the factual issues, judgment on the pleadings is generally inappropriate." *Ragsdale v. Kennedy*, 286 N.C. 130, 137, 209 S.E.2d 494, 499 (1974). "A complaint is fatally deficient in substance, and subject to a motion by the defendant for judgment on the pleadings if it fails to state a good cause of action for plaintiff and against defendant[.]" *Bigelow v. Town of Chapel Hill*, 227 N.C. App. 1, 3, 745 S.E.2d 316, 319 (2013) (citation omitted).

45. The Court may only consider "the pleadings and exhibits which are attached and incorporated into the pleadings." *Davis v. Durham Mental Health/Dev. Disabilities/Substance Abuse Area Auth.*, 165 N.C. App. 100, 104, 598 S.E.2d 237, 240 (2004) (citation omitted). The Court must "view the facts and permissible inferences in the light most favorable to the nonmoving party." *Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499. "A party who moves for judgment on the pleadings admits two things: (1) the truth of all well-pleaded facts in the non-movant's pleading, together with all permissible inferences to be drawn from such facts; and (2) the untruth of his own allegations in so far as they are controverted by the non-movant's pleading." *Hedrick v. Rains*, 121 N.C. App. 466, 468, 466 S.E.2d 281, 283 (1996). "All well pleaded factual allegations in the nonmoving party's pleadings are taken as true and all contravening assertions in the movant's pleadings are taken as false. All allegations in the nonmovant's pleadings, except conclusions of law, legally impossible facts, and matters not admissible in evidence at the trial, are deemed admitted by the movant." *Ragsdale*, 286 N.C. at 137, 209 S.E.2d at 499 (internal citations omitted).

46. The Sofield-Related Defendants and the Southeast Defendants seek judgment on the pleadings as to each of Plaintiff's claims against them. At the hearing, Plaintiff conceded that none of the claims in this case seek relief regarding the 2014 Equity Transaction. (Transcript of Oral Argument, at p. 40.) Thus, the Court will not discuss the 2014 Equity Transaction in its analysis, and to the extent

the Motions seek dismissal of any claims in the Complaint regarding the 2014 Equity Transaction, the Motions should be GRANTED.

47. The Court will first address the claims asserted against the three trusts, then discuss Plaintiff's allegations regarding Sofield's control over the Defendant entities, and lastly will address each claim in turn.

**B.  Trust Defendants**

48. Plaintiff purports to bring claims against the three trust defendants that were created by Sofield: the Green Trust, Portante Trust, and RTS III Trust.

49. The Sofield-Related Defendants argue for dismissal of the three trusts on the grounds that there are "no factual allegations [in the Complaint] about what these trust defendants might have done to justify being sued." (ECF No. 49, at p. 27.) Additionally, the Sofield-Related Defendants contend that a trust is "not a thing that could be haled into court." (*Id.*); *Americold Realty Trust v. ConAgra Foods, Inc.*, 136 S. Ct. 1012, 1016 (2016) (further stating that "legal proceedings involving a trust were brought by or against the trustees in their own name").

50. In their brief in opposition to the Sofield Motion (ECF No. 71), Plaintiff fails to respond to the Sofield-Related Defendants' arguments for dismissal of the three trusts.

51. After reviewing the allegations in the Complaint, the Court agrees with the Sofield-Related Defendants. Therefore, to the extent Plaintiff purports to bring any claims against the Green Trust, Portante Trust, and RTS III Trust, the Sofield

Motion should be GRANTED, and all such claims against the Green Trust, Portante Trust, and RTS III Trust should be DISMISSED.

## C. Sofield's Control of the Defendant Entities

52. Many of the claims brought by Plaintiff against Defendants turn on Plaintiff's sweeping allegations that Sofield controlled most of these entities, and on whether Sofield's actions can be attributed to the companies he controls through a reverse corporate veil-piercing theory.

53. In the Complaint, Plaintiff alleges that the various entities were "dominated and controlled by defendant Sofield" and that "[d]ue to the dominance and control by defendant Sofield said entities have no separate existence of their own and their acts and omissions are those of Sofield himself." (ECF No. 4, at ¶ 18.) In addition, Plaintiff alleges that Southeast is "controlled by defendant Sofield" and "Sofield retains almost complete control over defendants Equity, Southeast, Carolina Forests and Pine Forest." (ECF No. 4, at ¶¶ 46–47.)

54. In North Carolina, "[t]he general rule is that in the ordinary course of business, a corporation is treated as distinct from its shareholders." *State ex rel. Cooper v. Ridgeway Brands Mfg., LLC*, 362 N.C. 431, 438, 666 S.E.2d 107, 112 (2008). "Nevertheless, in a few instances, exceptions to the general rule of corporate insularity may be made when applying the corporate fiction would accomplish some fraudulent purpose, operate as a constructive fraud, or defeat some strong equitable claim. Those who are responsible for the existence of the corporation are, in those situations, prevented from using its separate existence to accomplish an

unconscionable result." *Id.* at 439, 666 S.E.2d at 112–13 (quotation marks and citation omitted). The doctrine of piercing the corporate veil applies to LLCs as well as to corporations. *Estate of Hurst v. Moorehead I, LLC*, 228 N.C. App. 571, 576, 748 S.E.2d 568, 573 (2013).

55.     To properly state a claim for piercing the corporate veil, a claimant must allege that "the corporation is so operated that it is a mere instrumentality or *alter ego* of the sole or dominant shareholder." *Green v. Freeman*, 367 N.C. 136, 145, 749 S.E.2d 262, 270 (2013) (emphasis in original) (internal quotation marks omitted) (citing *Henderson v. Security Mortg. & Finance Co.*, 273 N.C. 253, 260, 160 S.E.2d 39, 44 (1968)).

56.     The theory that Plaintiff seeks to use here is "reverse piercing," or "to make [the corporate entity] liable for [the dominating shareholder]'s actions (rather than piercing the veil to make [the dominating shareholder] personally liable for [the corporate entity]'s obligations)." *Strategic Outsourcing, Inc. v. Stacks*, 176 N.C. App. 247, 254, 625 S.E.2d 800, 804 (2006). "[W]here one entity is the alter-ego, or mere instrumentality, of another entity, shareholder, or officer, the corporate veil may be pierced to treat the two entities as one and the same, so that one cannot hide behind the other to avoid liability." *Fischer Inv. Capital, Inc. v. Catawba Dev. Corp.*, 200 N.C. App. 644, 650, 689 S.E.2d 143, 147 (2009) (citation omitted).

57.     To show that a corporation is a mere instrumentality of a dominant shareholder, a plaintiff must show:

> (1) Control, not mere majority or complete stock control,
> but complete domination, not only of finances, but of policy

and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of [a] plaintiff's legal rights; and,

(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of.

*Green*, 367 N.C. at 145–46, 749 S.E.2d at 270; *see also Cold Springs Ventures, LLC v. Gilead Sciences, Inc.*, 2015 NCBC LEXIS 1, at *18–20 (N.C. Super. Ct. Jan. 6, 2015) (applying the veil piercing factors to a reverse veil piercing claim).

58.     Under the first element, courts look to evidence of "inadequate capitalization, noncompliance with corporate formalities, lack of a separate corporate identity, excessive fragmentation, siphoning of funds by the dominant shareholder, nonfunctioning officers and directors, and absence of corporate records." *Green*, 367 N.C. at 145, 749 S.E.2d at 270. "[T]he presence or absence of any particular factor . . . is [not] determinative. Rather, it is a combination of factors which . . . suggest that the corporate entity attacked had no separate mind, will or existence of its own and was therefore the mere instrumentality or tool of the dominant corporation." *Fischer Inv. Capital, Inc.*, 200 N.C. App. at 651, 689 S.E.2d at 148 (internal citations and quotation marks omitted).

59.     Plaintiff fails to allege facts in support of any of the factors North Carolina courts consider in determining whether a party has enough control to pierce the corporate veil. While the "presence or absence of any particular factor" is not

dispositive, here Plaintiff makes the conclusory allegations that Sofield controlled or dominated the Defendant entities, but Plaintiff pleads no facts that go to any of the factors our courts consider in determining the level of control held by a majority shareholder or majority member.

60.     The Court concludes that Plaintiff's current allegations are insufficient to support the theory that Sofield so dominated the entities he was involved in that his actions should be attributed to those companies.  Nevertheless, in the event Defendants later attempt to argue that they cannot be held liable to certain conduct because it was Sofield's action, or vice-versa, the Court believes that Plaintiff should be permitted to develop facts through discovery that would support its veil piercing theory.

61.     Therefore, the Court concludes that to the extent the Southeast Motion seeks judgment on the pleadings dismissing the claims against Equity, Southeast, and Carolina Forests, the Southeast Motion should be GRANTED, and the claims should be dismissed WITHOUT PREJUDICE.  Additionally, to the extent the Sofield Motion seeks judgment on the pleadings dismissing the claims against Pine Forest, SPG, GPS, and Sofield Management, the Sofield Motion should be GRANTED, and the claims should be dismissed WITHOUT PREJUDICE.

62.     Because Sofield is the only remaining Defendant, the Court's analysis of the individual claims will focus on Sofield.

### D. Lack of Mental Capacity and Duress

63. Plaintiff attempts to bring causes of action for "lack of mental capacity to transfer interests" (Second Claim) and "damages due to duress" (Third Claim). (ECF No. 4, at ¶¶ 64–85.) The Sofield-Related Defendants argue that these claims should be dismissed because "lack of capacity" and "duress" are not causes of action but are rather affirmative defenses to a breach of contract action. (ECF No. 49, at pp. 19–20); *see Whitley v. Redden*, 276 N.C. 263, 267, 171 S.E.2d 894, 897 (1970) (discussing lack of sufficient mental capacity as a defense); *Delp v. Delp*, 53 N.C. App. 72, 77, 280 S.E.2d 27, 30 (1981) ("Duress and coercion are affirmative defenses . . . ."). In response, Plaintiff does not cite to any North Carolina authority recognizing a cause of action for lack of mental capacity or duress. (ECF No. 71, at pp. 14–17.)

64. The Court concludes that, absent appellate authority recognizing causes of action for lack of mental capacity or duress, the Sofield Motion as to Plaintiff's purported claims for lack of mental capacity and duress should be GRANTED.

### E. Breach of Fiduciary Duty

65. Plaintiff's First Claim is titled "Breach of Fiduciary Duty and Oppression of Minority Member." (ECF No. 4, at p. 21.) In the First Claim, Plaintiff alleges that Sofield owed a fiduciary duty to Gurkin based on being "the majority owner" of Equity. (*Id.* at ¶ 56.) Plaintiff does not allege that any other Defendant, including SPG, owed Gurkin a fiduciary duty or breached a fiduciary duty. (*Id.* at ¶¶ 56–63.)

66. "For a breach of fiduciary duty to exist, there must first be a fiduciary relationship between the parties." *Green,* 367 N.C. at 141, 749 S.E.2d at 268 (quotation marks and citation omitted). Fiduciary relationships are broadly defined by North Carolina's appellate courts and include "any possible case in which a fiduciary relationship exists in fact, and in which there is confidence reposed on one side, and *resulting domination and influence on the other*." *Kaplan v. O.K. Techs., L.L.C.,* 196 N.C. App. 469, 472, 675 S.E.2d 133, 136 (2009) (emphasis in original) (quoting *Dalton v. Camp,* 353 N.C. 647, 651, 548 S.E.2d 704, 707–08 (2001)).

67. Plaintiff is incorrect that Sofield was a majority member of Equity. Equity's Second Amendment to Operating Agreement, attached to the Sofield-Related Defendants' Answer, reveals that Sofield and Gurkin are both managers of the company, and that SPG—and not Sofield—is the majority member of Equity with a 75% membership interest. (ECF No. 6 at Ex. A, pp. 2–3, Schedule I.) Sofield also executed the Second Amendment to Operating Agreement in his capacity as President of Sofield Management, the manager of SPG, and not in his individual capacity. (*Id.* at Ex. A.)

68. Pursuant to North Carolina's Limited Liability Act, "a manager of a limited liability company 'shall discharge his duties as manager in good faith, with the care an ordinary prudent person in a like position would exercise under similar circumstances, and in the manner the manager reasonably believes to be in the best interests of the limited liability company.'" *Kaplan*, 196 N.C. App. at 473, 675 S.E.2d at 137 (quoting N.C.G.S. § 57C-3-22(b)). These duties are owed by the manager to

the *company* and not to the other managers. *Id.* at 474, 675 S.E.2d at 137. Plaintiff is only bringing an individual claim, as Plaintiff has not made any allegations of a derivative claim on behalf of Equity as a member.

69.     Additionally, the Court has carefully reviewed Equity's Operating Agreement and its amendments, and it does not establish a contractual fiduciary relationship that runs from Sofield as a manager to Gurkin as a member. *See Finkel v. Palm Park, Inc.*, 2019 NCBC LEXIS 38, at *31 (N.C. Super. Ct. June 11, 2019) (holding that a fiduciary relationship extended to the individual plaintiff when the Company's Operating Agreement included a provision stating: "[The managers shall] [b]e under a fiduciary duty to conduct the affairs of [Company] in the best interests of the Company and of the Members, including the safekeeping and use of all the Company Property."). Accordingly, Sofield did not owe a fiduciary duty directly to Gurkin because of his status as a manager.

70.     Therefore, to the extent the Sofield Motion seeks judgment on the pleadings as to Plaintiff's claim for breach of fiduciary duty by Sofield, the Sofield Motion should be GRANTED.

### F.     Undue Influence

71.     Undue influence is a claim usually raised in will contests, arising from allegations that someone induced the testator, in a weakened mental state, to revoke or alter a will. This case, of course, does not involve a will contest.[4] Instead,

---

[4] The Sofield-Related Defendants do not argue that a claim for undue influence can only be raised in a case involving a will contest, and the Court is not aware of North Carolina appellate authority so limiting the claim.

Plaintiff alleges that Sofield used "the special confidence and trust which [Gurkin] had previously reposed in him" and Gurkin's "weakened mental and physical condition" due to his cancer to "demand[ ] that [Gurkin] execute a complicated membership purchase agreement which was prepared by attorneys engaged by defendant Sofield." (ECF No. 4, at ¶¶ 91–93.)

72. The Sofield-Related Defendants move for judgment on the undue influence claim, arguing that Gurkin could not have been unduly influenced during the 2016 RTS-DMC Transaction, because his cancer diagnosis did not occur until mid-2017. (ECF No. 49, at pp. 20–21.) As to the 2017 Pine Forest Transaction, which occurred on December 21, 2017, the Sofield-Related Defendants argue that Sofield executed the transaction on Equity's behalf and that Gurkin could not have been unduly influenced to act in any particular way because Plaintiff alleges that Gurkin had no knowledge of the terms of this transaction until after it had occurred. (*Id.* at p. 21.) Lastly, as to the 2018 Southeast Transaction, the Sofield-Related Defendants argue that "Gurkin was not required to sell his interests" and Gurkin executed the Membership Interest Purchase Agreement. (*Id.*)

73. Our appellate courts have observed that undue influence "is usually difficult to prove." *In re Will of Dunn*, 129 N.C. App. 321, 328, 500 S.E.2d 99, 104 (1998). It "is defined as 'the exercise of an improper influence over the mind and will of another to such an extent that his professed act is not that of a free agent, but in reality is the act of the third person who procured the result.'" *Hayes v. Turner*, 98 N.C. App. 451, 456, 391 S.E.2d 513, 516 (1990) (quoting *Lee v. Ledbetter*, 229 N.C.

330, 332, 49 S.E.2d 634, 636 (1948)). Undue influence requires "more than mere influence or persuasion because a person can be influenced to perform an act that is nevertheless his voluntary action." *In re Will of Jones*, 362 N.C. 569, 574, 669 S.E.2d 572, 577 (2008) (quoting *In re Will of Andrews*, 299 N.C. 52, 53, 261 S.E.2d 198, 199 (1980)). "It is close akin to coercion produced by importunity, or by a silent, resistless power, exercised by the strong over the weak, which could not be resisted, so that the end reached is tantamount to the effect produced by the use of fear or force." *Id.* (quoting *In re Will of Turnage*, 208 N.C. 130, 132, 179 S.E. 332, 333 (1935)).

74. "That is a high bar and, of course, requires evidence that the victim is in a physical or mental state that renders him or her subject to the coercive influence of another. Individuals who are of sound mind and body are generally not susceptible to undue influence." *Bohn v. Black*, 2019 NCBC LEXIS 35, at \*24–25 (N.C. Super Ct. June 3, 2019) (Conrad, J.). The Complaint alleges that Gurkin's cancer diagnosis did not occur until mid-2017, and that it was because of the diagnosis and subsequent treatment for the cancer that Gurkin was in a weakened mental and physical state. Plaintiff does not allege that Gurkin was in any "physical and mental weakness" prior to his mid-2017 cancer diagnosis. *In re Will of Campbell*, 155 N.C. App. 441, 455, 573 S.E.2d 550, 561 (2002). Thus, Plaintiff has failed to adequately allege that Gurkin was unduly influenced during the 2016 RTS-DMC Transaction. Additionally, in Plaintiff's Brief in Opposition to the Sofield Motion, Plaintiff responds only to Defendants' arguments regarding Sofield's undue influence over Gurkin in the 2018 Southeast Transaction, and does not make any argument regarding the 2017 Pine

Forest Transaction. As a result, to the extent the Sofield Motion seeks dismissal of Plaintiff's claim for undue influence as to the 2016 RTS-DMC Transaction and the 2017 Pine Forest Transaction, the Sofield Motion should be GRANTED.

75. However, with regard to the 2018 Southeast Transaction, the Court concludes that Plaintiff has alleged facts sufficient to support the claim for undue influence.

76. In the Complaint, Plaintiff provides extraordinary detail regarding Gurkin's cancer diagnosis and subsequent treatments, and its effect on Gurkin's mental and physical condition. (ECF No. 4, at ¶¶ 37–39.) Plaintiff alleges that Sofield knew of Gurkin's weakened state. (*Id.* at ¶¶ 37, 42.) Additionally, Plaintiff states that, during the 2018 Southeast Transaction, Sofield told Gurkin that he was "getting out" and that Gurkin had to also sell his interest in Equity. (*Id.* at ¶ 40.) Sofield presented Gurkin with a Membership Interest Purchase Agreement, which Sofield told Gurkin that "he had to sign or 'they' would 'tear him apart' and would 'take everything he had'" and that "'they', referring to defendant Southeast, were the only possible buyers." (*Id.* at ¶¶ 40, 42.) Sofield told Gurkin that the "sum of $2,583,689.89 was the best [Gurkin] could obtain from the property." (*Id.* at ¶ 97.) Although Gurkin signed the Membership Interest Purchase Agreement, Plaintiff alleges that Gurkin "had no one to advise him and had no opportunity to review the agreement with counsel." (*Id.* at ¶ 42.) These allegations are enough at this stage of the case to support Plaintiff's claim for undue influence.

77.    Accordingly, to the extent the Sofield Motion seeks to dismiss Plaintiff's undue influence claim based on the 2018 Southeast Transaction, the Sofield Motion should be DENIED.

## G.    Fraud and Misrepresentation

78.    Plaintiff's claim for "Fraud and Misrepresentation" alleges that Sofield "falsely represented" facts to, and "concealed material facts from," Gurkin:

> causing him to sign over his interest in [ ] Equity and causing the previous conveyance of approximately 183.20 acres [the 2017 Pine Forest Transaction] . . . and stated that such transactions were in the best interest of the business entities and the development plans and potential, that he, Sofield was "getting out" and that signing away his interests was [Gurkin's] only option and that [Gurkin] had no choice except to sign over his interest in the entities and property and selling those interests were the only way that he could gain any benefit out of the years of hard work he had put into the property, that the sum of $2,583,689.89 was the best [Gurkin] could obtain from the property . . . .

(ECF No. 4, at ¶¶ 97–98.)

79.    Plaintiff also alleges that Sofield told Gurkin that "he had to sign [the Membership Interest Purchase Agreement] or 'they' would 'tear him apart' and would 'take everything he had'" and that "'they', referring to defendant Southeast, were the only possible buyers." (*Id*. at ¶¶ 40, 42.)

80.    In addition, although Plaintiff does not expressly allege that Sofield made misrepresentations or concealed facts regarding the 2016 RTS-DMC Transaction in the claim for fraud and misrepresentation, in the Brief in Opposition to the Sofield Motion, Plaintiff argues that Sofield made such misrepresentations. (ECF No. 71, at p. 20.)  Accordingly, the Court will consider the claim for fraud as to

the 2016 RTS-DMC Transaction, the 2017 Pine Forest Transaction, and the 2018 Southeast Transaction.

81. The essential elements of fraud are: "(1) [f]alse representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, (5) resulting in damage to the injured party." *Terry v. Terry*, 302 N.C. 77, 83, 273 S.E.2d 674, 677 (1981) (citation omitted). North Carolina is a notice pleading state. N.C. R. Civ. P. 8(a)(1). Under North Carolina Rule of Civil Procedure 9(b), allegations of fraud must be pleaded "with particularity." Rule 9(b); *Terry*, 302 N.C. at 85, 273 S.E.2d at 678. Additionally, the deceived party must have reasonably relied on the allegedly false representations. *Forbis v. Neal*, 361 N.C. 519, 527, 649 S.E.2d 382, 387 (2007).

82. Plaintiff argues that Sofield made the following misrepresentations regarding the 2016 RTS-DMC Transaction "on or about November 1, 2016":

> (1) he failed to disclose the conveyance of the 1.32-acre tract from defendant SPG to defendant RTS-DMC; (2) he failed to disclose the details of the lease with Novant Health; (3) he failed to disclose the financial details of the transactions; and (4) he failed to disclose that the transfer had been made as Gurkin was unaware of the completed transaction until after it was completed.

(ECF No. 71, at p. 20; *see also* Complaint, ECF No. 4, at ¶ 34.)

83. As to the 2016 RTS-DMC Transaction, the Sofield-Related Defendants argue that Plaintiff's claim that Gurkin did not know about the transaction because of Sofield's concealments is false because Gurkin gave his consent when he signed the "Unanimous Written Consent of the Members and Managers of Equity" (ECF No.

29.1). (ECF No. 79, at p. 9.) The Unanimous Written Consent expressly states all the information that Gurkin alleges was concealed: that SPG desires to own 1.32 acres of the property for purposes unrelated to Equity; that SPG intends to develop the property and lease it to a third party; and that the value of the parcel SPG wishes to own is worth $200,000. (ECF No. 29.1, at pp. 1–3.) The Unanimous Written Consent also gave Sofield broad authority to complete the remaining steps of the 2016 RTS-DMC Transaction without seeking further consent from Gurkin. (*Id*. at pp. 2–3.)

84. As to misrepresentations made by Sofield during the 2017 Pine Forest Transaction "on or about December 21, 2017," Plaintiff claims:

> (1) he failed to disclose any financial information or details relating to the transaction, in which he received an interest; (2) he failed to disclose that there was an impending development of the property; and (3) he failed to disclose that he was involved in its development.

(ECF No. 71, at pp. 20–21; *see also* Complaint, ECF No. 4, at ¶¶ 35–36.)

85. With regard to the 2017 Pine Forest Transaction, the Sofield-Related Defendants argue that Plaintiff's allegation that Gurkin knew about the transaction and objected to it defeats any claim that Gurkin was deceived by, or reasonably relied on, Sofield's concealments. (ECF No. 79, at pp. 9–10; ECF No. 4, at ¶ 36.)

86. The Court concludes that Plaintiff fails to state a claim for fraud and misrepresentation against Sofield arising from the 2016 RTS-DMC Transaction and the 2017 Pine Forest Transaction. Gurkin's execution of the "Unanimous Written Consent" to the 2016 RTS-DMC Transaction undermines the allegation that Sofield

misrepresented and concealed the terms of that transaction from Gurkin, and Gurkin's objection to the 2017 Pine Forest Transaction defeats Plaintiff's allegations that Gurkin reasonably relied on any concealment by Sofield. Accordingly, to the extent the Sofield Motion seeks judgment on Plaintiff's claim for fraud and misrepresentation based on the 2016 RTS-DMC Transaction and the 2017 Pine Forest Transaction, the Sofield Motion should be GRANTED.

87. As to the 2018 Southeast Transaction, the Sofield-Related Defendants argue that Plaintiff fails to meet the heightened pleading requirement for fraud and has not alleged the specific time, place, or content of any misrepresentation to Gurkin. (ECF No. 49, at pp. 22–23.) Additionally, the Sofield-Related Defendants argue that the representations made by Sofield during the 2018 Southeast Transaction were statements of Sofield's opinion as to the value of Equity. (*Id.* at pp. 23–24.)

88. Plaintiff alleges in detail the specific date, location, and individual who made the misrepresentations. (ECF No. 4, at ¶ 40.) Plaintiff also sufficiently alleges the contents of the misrepresentations made by Sofield to survive a motion for judgment on the pleadings. Plaintiff alleges Sofield told Gurkin: (1) that Sofield was "getting out" of Equity; (2) that signing away Gurkin's interest was his only option; (3) that Gurkin had no choice except to sign over his interest and selling his interest was the only way he would gain any benefit from the property; (4) $2,583,689.89 was the best Gurkin could get from the property; and (5) that "he had to sign or 'they' would 'tear him apart' and would 'take everything he had'" and that "'they', referring to defendant Southeast, were the only possible buyers." (*Id.* at ¶¶ 40, 42.)

89. The Court acknowledges that it is not clear what some of Sofield's alleged statements mean and that some may constitute opinions. But while the Sofield-Related Defendants are correct that statements of opinion cannot form the basis of a fraud claim, *Rowan Cty. Bd. of Educ. v. United States Gypsum Co.*, 332 N.C. 1, 17, 418 S.E.2d 648, 659 (1992), Plaintiff's allegations are sufficient at this time to survive a motion for judgment on the pleadings. These misrepresentations were made at a time that Gurkin was in a "weakened mental and physical" state due to his cancer diagnosis and treatment and were made "without revealing to [Gurkin] that [Sofield] was in fact the purchaser, or at the very least controlled the purchasing entity." (ECF No. 4, at ¶ 42.) The circumstances surrounding the 2018 Southeast Transaction and Sofield's statements that he was "getting out" and unless Gurkin signed the Membership Interest Purchase Agreement, "they" would "tear him apart" and "take everything he had," are enough to satisfy the Court at this time that Plaintiff has sufficiently alleged that Sofield strong-armed Gurkin into the 2018 Southeast Transaction without revealing Sofield's financial interest in the transaction. Plaintiff also has adequately alleged that Gurkin relied on Sofield's statements when Gurkin signed the Membership Interest Purchase Agreement.

90. Therefore, Plaintiff has sufficiently stated a claim for fraud and misrepresentation to survive a motion for judgment on the pleadings as to the 2018 Southeast Transaction, and accordingly, the Sofield Motion should be DENIED as to that transaction.

## H.    Unjust Enrichment

91.    Although Plaintiff voluntarily dismissed the claim for constructive trust (Sixth Claim), Plaintiff nevertheless argues in its briefs that the Complaint still states a viable claim for unjust enrichment. (ECF No. 71, at pp. 23–25; ECF No. 72, at pp. 18–20.) Plaintiff is incorrect. To the extent Plaintiff attempted to make a claim for unjust enrichment, the allegations were contained exclusively in the Sixth Claim. (ECF No. 4, at ¶¶ 103–107.) Plaintiff dismissed the Sixth Claim with prejudice and cannot now attempt to revive it in briefing. Thus, to the extent the Complaint alleged a claim for unjust enrichment, the unjust enrichment claim has been dismissed.

## I.    UDTPA

92.    Plaintiff's claim under the UDTPA is based on "Defendants' actions and false representations, other fraudulent activity and breach of fiduciary duties." (ECF No. 4, at ¶ 110.) Since Plaintiff has not made any more specific allegation regarding the conduct at issue, the Court will decide whether Plaintiff has sufficiently alleged that Sofield's conduct related to the 2016 RTS-DMC, 2017 Pine Forest, and 2018 Southeast Transactions constitutes a viable claim for unfair or deceptive trade practices.

93.    A UDTPA claim requires a plaintiff to show: "(1) an unfair or deceptive act or practice; (2) in or affecting commerce; which (3) proximately caused actual injury to the claimant." *Cordaro v. Harrington Bank, FSB*, 817 S.E.2d 247, 257 (N.C. Ct. App. 2018). Fraud and misrepresentation and breach of fiduciary duty can form the basis of a UDTPA claim. *See Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 88,

747 S.E.2d 220, 226 (2013); *Compton v. Kirby*, 157 N.C. App 1, 20, 577 S.E.2d 905, 917 (2003). However, the Court has dismissed Plaintiff's breach of fiduciary duty claim, and has dismissed the fraud and misrepresentation claim to the extent it is based on the 2016 RTS-DMC Transaction and the 2017 Pine Forest Transaction. Accordingly, to the extent the Sofield Motion seeks judgment with regard to a UDTPA claim based on the 2016 RTS-DMC and 2017 Pine Forest Transactions, it should be GRANTED.

94. This leaves for consideration Plaintiff's UDTPA claim arising from the 2018 Southeast Transaction. The Sofield-Related Defendants argue that "[Plaintiff's] allegations about conduct that induced that sale, and the allegations about the terms of the sale, arise out of the sale of securities—specifically, the membership interests in Equity. As a matter of law, allegations of this kind are not "in or affecting commerce." (ECF No. 49, at p. 26.) Sofield relies on *HAJMM, Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 403 S.E.2d 483 (1991) for this proposition. In *HAJMM*, the North Carolina Supreme Court held that "in or affecting commerce" includes "business activities," "which connotes the manner in which businesses conduct their regular, day-to-day activities, or affairs, such as the purchase and sale of goods, or whatever other activities the business regularly engages in and for which it is organized." *Id.* at 594, 403 S.E.2d at 493. The court concluded that securities transactions, because they are "related to the creation, transfer, or retirement of capital," are not business activities and are not "in or affecting commerce." *Id.*

95.    In this case, the 2018 Southeast Transaction involved the sale of Gurkin and SPG's membership interests in Equity to Southeast.   However, the Sofield-Related Defendants fail to argue how the allegations in the Complaint establish, as a matter of law, that Gurkin's membership interest constituted a "security."   Under regulations promulgated by the North Carolina Secretary of State pursuant to the North Carolina Securities Act, N.C.G.S. § 78A-1 *et seq.*, there is a rebuttable presumption that a membership interest in a limited liability company is a security interest.   18 NCAC 06A.1510; *see also Saw Plastic, LLC v. Sturrus*, 2017 NCBC LEXIS 76, at *14–17 (N.C. Super. Ct. Aug. 25, 2017).   18 NCAC 06A.1510 provides, in relevant part, as follows:

> (a) Membership interests . . . in a limited liability company shall be presumed to be securities within the meaning of [N.C.]G.S.   78A-2(11)   in   either   of   the   following circumstances:
>
> (1) where the articles of organization of the limited liability company provide that all members of the limited liability company are not necessarily managers by virtue of their status as members; or (2) where all members by virtue of their status as members are managers of the limited liability company and the number of members is greater than 15.
>
> (b) Among the factors that will be considered . . . as evidence offered to rebut or support the presumption in Paragraph (a) of this Rule are: (1) whether investors retain, under the limited liability company's operating agreement, the right to exercise practical and actual control over the managerial decisions of the enterprise . . .

96.    The original Operating Agreement for Equity provided that Gurkin is a Manager of Equity.   (Operating Agreement, ECF No. 6 at Ex. A, pp. 6, 9, 26.)

Pursuant to the amendment to the Operating Agreement executed in the 2014 Equity Transaction, Gurkin and Sofield are Equity's Managers. (Agreement and Second Amendment to Operating Agreement, ECF No. 6, at Ex. A.) In addition, Plaintiff alleges that as part of the 2014 Equity Transaction, Sofield and Gurkin agreed "they would consult and agree on all major decisions and would essentially act as partners." (ECF No. 4, at ¶ 28.) These allegations suggest that Gurkin had "the right to exercise practical and actual control over the managerial decisions of [Equity]" that would tend to rebut the presumption that Gurkin's membership in Equity was a security.[5] *See* 18 NCAC 06A.1510(b). Therefore, the Court concludes that the Sofield-Related Defendants have failed to establish that Plaintiff's allegations foreclose Plaintiff's claim for violation of the UDTPA arising from the 2018 Southeast Transaction on the grounds that the transaction was a securities transaction that was not in or affecting commerce. To the extent the Sofield Motion seeks judgment with regard to a UDTPA claim arising from the 2018 Southeast Transaction, it should be DENIED.

III.    CONCLUSION

THEREFORE, IT IS ORDERED that:

1.    To the extent the Motions seek dismissal of any claims based on the 2014 Equity Transaction, the Motions are GRANTED.

---

[5] The Court notes that the amendment also revises § 3.1 of the Operating Agreement to provide that despite the fact that Gurkin was a Manager, "the action or decision of ROBERT THOMAS SOFIELD, JR. . . . shall be binding on [Equity] without the consent or joinder of any other Manager or Member." (Agreement and Second Amendment to Operating Agreement, ECF No. 6, at Ex. A.) This provision casts doubt on Gurkin's continued right to exercise practical and actual control over the managerial decisions of Equity following the 2014 Equity Transaction, and creates an issue of fact that cannot be resolved at this stage of the proceedings.

2. To the extent the Southeast Motion seeks judgment on the pleadings as to Plaintiff's claims against Equity, Southeast, and Carolina Forests, the Southeast Motion is GRANTED, and the claims against them are dismissed WITHOUT PREJUDICE.

3. The Sofield Motion is GRANTED as to Plaintiff's claims against the Green Trust, Portante Trust, and RTS III Trust.

4. To the extent the Sofield Motion seeks judgment on the pleadings as to Plaintiff's claims against Pine Forest, SPG, GPS, and Sofield Management, the Sofield Motion is GRANTED, and the claims against them are dismissed WITHOUT PREJUDICE.

5. The Sofield Motion is GRANTED as to Plaintiff's claims for lack of mental capacity and duress.

6. To the extent the Sofield Motion seeks judgment on the pleadings as to Plaintiff's claim for breach of fiduciary duty, the Sofield Motion is GRANTED.

7. To the extent the Sofield Motion seeks judgment on the pleadings as to Plaintiff's undue influence claim based on the 2016 RTS-DMC Transaction and the 2017 Pine Forest Transaction, the Sofield Motion is GRANTED.

8. To the extent the Sofield Motion seeks judgment on the pleadings as to Plaintiff's undue influence claim based on the 2018 Southeast Transaction, the Sofield Motion is DENIED.

9. To the extent the Sofield Motion seeks judgment on the pleadings as to Plaintiff's claim for fraud and misrepresentation based on the 2016 RTS-DMC Transaction and the 2017 Pine Forest Transaction, the Sofield Motion is GRANTED.

10. To the extent the Sofield Motion seeks judgment on the pleadings as to Plaintiff's claim for fraud and misrepresentation based on the 2018 Southeast Transaction, the Sofield Motion is DENIED.

11. To the extent the Sofield Motion seeks judgment on the pleadings as to Plaintiff's UDTPA claim based on the 2016 RTS-DMC Transaction and the 2017 Pine Forest Transaction, the Sofield Motion is GRANTED.

12. To the extent the Sofield Motion seeks judgment on the pleadings as to Plaintiff's UDTPA claim based on the 2018 Southeast Transaction, the Sofield Motion is DENIED.

SO ORDERED, this the 15th day of April, 2020.

/s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge
for Complex Business Cases